DeCICCO, Senior Judge:
The Court on its own motion has reconsidered the previous opinion in this case dated 30 June 1995. That opinion is withdrawn and the following constitutes the opinion of the Court.
The principal issue in this appeal is whether the trial judge erred in denying the appellant’s motion to suppress his pretrial confession. We hold that he did and accordingly set aside the finding of guilty regarding theft of a pistol. We affirm the remaining findings of guilty and reassess the sentence.
The appellant was convicted by a general court-martial, military judge alone, of failure to go to his appointed place of duty, theft of a government pistol, wrongful appropriation of a pair of combat boots, and wrongful use of amphetamines/methamphetamines, in violation of Articles 86, 121, and 112a, Uniform Code of Military Justice [UCMJ], 10 U.S.C. §§ 886, 921, 912a. The appellant pled guilty to all these charges except the one relating to theft of a pistol. The military judge sentenced him to confinement for one year, forfeiture of all pay and allowances, reduction to pay grade E-l, and a bad-conduct discharge. The convening authority approved the sentence, with the exception that total forfeitures were approved until such time as confinement was lawfully terminated, after which forfeitures would be $543.00 per month. The appellant raises two issues in this appeal, both of which relate only to the charge of stealing the pistol.[1]
*656 FACTS
On 18 March 1993, an inventory revealed that a pistol was missing from the armory of 1st Medical Battalion, 1st Force Service Support Group, Camp Pendleton, California. After conducting a JAG Manual Investigation, the investigating officer noted numerous security and accountability violations. Defense Ex. C. She determined that the pistol had not been accounted for since November 1992, and that “[t]he only evidence indicating possible theft of [the pistol] is that it is missing.” Defense Ex. D.
The appellant, who had worked in the armory until 9 February 1993, was interviewed by the Naval Criminal Investigative Service [NCIS] a total of four times. Record at 46. On the fourth occasion, 18 May 1993, the appellant was directed to report to the unit classroom at approximately 0900. NCIS special agents were waiting there to interview him. Record at 79. An agent advised him of his rights; the appellant acknowledged in writing that he understood these rights. Prosecution Ex. 9.
The agent asked the appellant if he had any knowledge as to the whereabouts of the missing pistol. According to the appellant, he informed the agent that he had heard that a friend of his had a weapon similar to the one that had been stolen. After picking up a second agent, the three of them proceeded to the house of the friend. Record at 80-81.
After showing the agents the location of the house, the appellant and the agents returned to NCIS headquarters, where the first agent continued to interrogate the appellant. The agent testified at a pretrial hearing that at approximately 1415, the appellant admitted to taking the weapon and at approximately 1455 agreed to give a sworn statement. The agent then typed a statement with the appellant in the room. Record at 40-41.
The agent testified that he completed the statement at approximately 1610 or 1620, at which time he gave it to the appellant to “read and initial and make any corrections which he wished to make.” Record at 41. The appellant made and initialled several corrections, but according to the appellant, these were pointed out by the agent. Record at 83, 87.
The agent then asked the appellant to sign the statement. The appellant refused, asking instead to take the statement home before signing because it did not “sound right” to him and was not in his own wording. Record at 41, 83.
After indicating that this would be acceptable, the agent left to make a copy of the statement. He told other agents he was having trouble with the appellant. Instead of returning with a copy for the appellant to take home, he returned with a second NCIS agent. The second agent went into the room because the appellant refused to sign the statement and to act as a witness. The two agents discussed the statement with the appellant and repeatedly asked him why he would not sign it. They denied using'threats or applying pressure. The appellant continued to assert that it did not sound right to him and was not in his own wording, but after 15 to 20 minutes, he finally acquiesced and signed it. Record at 41-42, 50, 54-55, 84. The appellant claimed that he signed it “just to get out of there.” Record at 84.
The testimony of both the appellant and the agent confirms that the appellant was offered beverages and opportunities to use the bathroom. However, the appellant missed lunch at the chow hall, and it is disputed whether the agents offered him anything to eat. Record at 40, 50, 82.
Prior to the trial, the appellant moved to suppress the statement, asserting that it had been made involuntarily. Appellate Ex. II. The trial judge conducted a hearing, during which the defense put on uncontroverted expert testimony that the appellant suffered from a “Receptive Language Developmental Disorder.” Record at 68. According to the expert, people with this disorder have difficulty “[ejncoding information ... coming in to them. It’s an information processing problem.” Record at 63. The expert further testified that under normal circumstances, the appellant “probably does okay,” but that when under stress, the problem may become “moderate or even severe,” resulting in difficulty in understanding and making decisions. Record at 68-69. According to the expert, *657 the only coping mechanism for such a disability is “to review and ... not be hurried— There would be a whole history of thinking that they understood and upon review, finding that they had not truly understood, so a coping mechanism would be to take time to truly understand, reflect, think about it, maybe get ... input from others — ” Record at 69. The officer who conducted the JAG Manual investigation testified that it seemed to her that the appellant “could be fairly easily led.” Record at 199.
The judge denied the motion to suppress and stated that he would enter his essential findings after he had received the record of trial. Record at 97. He nevertheless failed to do so; no essential findings are attached to the record.
ESSENTIAL FINDINGS
First, we will consider the judge’s failure to enter the required essential findings. When factual issues are involved in ruling on a motion, a trial judge has a mandatory sua sponte duty to state the “essential findings” on the record which support his or her ruling. Rules for Courts-Martial [R.C.M.], Rule 905(d); United States v. Postle, 20 M.J. 632 (N.M.C.M.R.1985). Mil.R.Evid. 304(d)(4) specifically requires a judge to enter such essential findings when ruling on a motion to suppress evidence of confessions or admissions. There is no doubt that in this case, the trial judge erred in failing to do so.
We again stress the importance of entering essential findings on the record and urge trial judges to do so contemporaneously with the ruling. This practice not only minimizes the possibility of error such as occurred here, but enhances the discipline and integrity of the decision-making process. Essential findings prepared after a ruling “may become nothing more than a post hoc rationalization.” United States v. Flores-Galarza, 40 M.J. 900, 906 n. 9 (N.M.C.M.R.1994).
The usual remedies for a failure to enter the required essential findings are a rehearing or a return of the record of trial to the military judge for entry of the essential findings. United States v. Butterbaugh, 21 M.J. 1019 (N.M.C.M.R.1985). However, in some cases, we may be able to resolve the matter through our fact-finding power. Article 66(c), UCMJ, 10 U.S.C. § 866(c); United States v. Spriddle, 20 M.J. 804 (N.M.C.M.R. 1985). We find this latter course appropriate for this case.
The following are our essential findings supporting our conclusion that the statement was involuntary:
1. The appellant had a learning disability that impaired his ability to understand and make decisions when under stress.
2. The appellant was a private first class at the time of his questioning with less than three years in the service. Pros. Ex. 10.
3. The appellant was more easily led than the average person.
4. NCIS interviewed the appellant a total of four times; the final interview on 18 May 1993 resulted in the statement in question.
5. The appellant was ordered to report to the unit classroom, where his interrogation began.
6. The appellant was advised of his rights and understood them.
7. The appellant was offered beverages and the opportunity to use the restroom, but in the course of the interrogation, he missed lunch at the chow hall.
8. The appellant was continuously interrogated from 0900 until he signed the statement at 1650, for a total of almost 8 hours.
9. The written statement was prepared by the agent, not the appellant.
10. Corrections initialled by the appellant were pointed out by the agent.
11. The appellant refused to sign the statement, stating that it did not “sound right” to him, and asked to take it home before signing.
12. Instead of immediately honoring the appellant’s request, the agent brought in a second agent.
13. The second agent entered the room for the purpose of convincing the appellant to sign the statement.
14. The two agents persistently asked the appellant why he would not sign for 15-20 minutes before he finally did sign.
*658 ADMISSIBILITY OF THE CONFESSION
The appellant asserts that his signed confession should have been suppressed because it was involuntary. Considering the circumstances of this case, we agree. Generally, involuntary statements are inadmissible at trial. Mil.R.Evid. 304(a); United States v. Lonetree, 35 M.J. 396 (C.M.A.1992), cert, denied, 507 U.S. 1017, 113 S.Ct. 1813, 123 L.Ed.2d 444 (1993). “A statement is ‘involuntary’ if it is obtained in violation of the self-incrimination privilege or due process clause of the Fifth Amendment to the Constitution of the United States, Article 31, or through the use of coercion, unlawful influence, or unlawful inducement.” Mil.R.Evid. 304(c)(3).
Upon appropriate motion by the defense, the government has the burden of proving the voluntariness of a confession by a preponderance of the evidence. Mil.R.Evid. 304(e); Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). Voluntariness is a question of law and therefore subject to de novo review. Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).
In United States v. Bubonics, 40 M.J. 734 (N.M.C.M.R.1994), certificate for review filed, 41 M.J. 355 (C.M.A.1994), we summarized the principles for determining when a pretrial statement was the product of coercion, unlawful influence, or unlawful inducement:
(1) If the confession is the product of an essentially free and unconstrained choice by its maker, it may be used against him. If his will has been overborne and his capacity for self-determination critically impaired, the confession may not be used against him.
(2) Whether a particular accused’s will has been overborne and broken must be decided on the peculiar, individual facts of his case.
(3) The totality of all the circumstances — both the characteristics of the accused and the details of the interrogation — must be assessed.
(4) Some of the factors to be taken into account include: the accused’s age; his education; his intelligence; the advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; the use of physical punishment, such as the deprivation of food or sleep.
(5) The import of the factors vary according to the circumstances and the state of mind of the accused.
(6) The constituent elements of the interrogation leading to the confession may be reviewed separately, however, the circumstances should be evaluated together.
(7) Absent police conduct causally related to the confession, there is no basis for concluding a confession was involuntarily induced, and even where there is a causal connection between the actions of Government agents and an accused’s confession, it does not automatically follow that the confession was involuntary.
(8) Ploys to mislead a suspect or lull him into a false sense of security do not render a statement involuntary, provided they do not rise to the level of compulsion or coercion.
Id. at 739.
A defendant’s mental condition, “by itself and apart from its relation to official coercion,” is not dispositive of voluntariness. Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Nevertheless, it may take far less coercion to compel a confession from a person who is easily led or of low mentality than from a stronger-willed person. United States v. Vigneault, 3 C.M.A. 247, 12 C.M.R. 3 (1953).
We find that the government failed to carry its burden of proving that the appellant’s written confession was voluntary. The appellant was a relatively junior, inexperienced Marine who had a learning disability and was easily led. At the time he signed the statement, he had been subjected to over 7 hours of interrogation as well as three previous interrogation sessions. The appellant expressed that the words in the statement were not his and that he did not desire to adopt them as his own until he had a *659 chance to look them over at home. The agents, knowing this, overcame his will through 15-20 minutes of intense, two-on-one interrogation following his clear request.
Moreover, even statements that meet the traditional voluntariness test just discussed may still be per se inadmissible. Under both the Miranda doctrine[2] and the Military Rules of Evidence, as soon as a person indicates that he wishes to exercise his privilege against self-incrimination, all questioning must cease immediately. Mil.R.Evid. 305(f); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Statements obtained in contravention of these rules are inadmissible. Mil.R.Evid. 304(a); Miranda, 384 U.S. at 473, 86 S.Ct. at 1626.
While the Government is not forever barred from reapproaching a suspect who has invoked his right to remain silent, the person’s “right to cut off questioning” must be “scrupulously honored.” Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (citing Miranda, 384 U.S. at 479, 86 S.Ct. at 1630); United States v. Watkins, 34 M.J. 344 (C.M.A.1992). Resuming interrogation “after a momentary cessation would clearly frustrate the purposes of Miranda ...” Mosley, 423 U.S. at 102, 96 S.Ct. at 325.
We must decide whether the appellant invoked his right to remain silent and, if so, whether the agents violated that right by interrogating him after the invocation. A refusal to sign a statement can constitute an invocation of his right to remain silent. United States v. Christian, 22 M.J. 519 (N.M.C.M.R.1986).
We hold that under the circumstances of this case, the appellant’s request to go home and refusal to sign the statement constituted an invocation of his right to remain silent. Even though he had made prior oral admissions and had even agreed to work on a written admission, the appellant had the right to terminate questioning at any time and not to make further statements. The written statement, prepared by the agent, was not the appellant’s own statement until he adopted it by his signature. When the appellant read the statement, he not only stated that it did not sound right, but he unambiguously stated that he did not wish to sign it until he had a chance to take it home and digest it. It was his choice not to make the statement, and his expressed desire to depart and not to sign at that time invoked his right to remain silent.
The next issue is whether the agents’ efforts to get the appellant to sign the statement were “interrogation.” We hold that they were. In United States v. Sager, 36 M.J. 137 (C.M.A.1992), the Court stated that they were “not convinced that the mere typing and securing of appellant’s signature concerning his prior admissions can be likely perceived as interrogation for purposes of Miranda.” Id. at 146 (citing Pennsylvania v. Muniz, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990); Arizona v. Mauro, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987)).
The case at bar, however, presents a different situation. The signature in this case was testimonial evidence, as opposed to the physical evidence dealt with in Muniz. The agents were not trying to procure the signature to study its physical characteristics. Rather, their efforts were directed at persuading the appellant to adopt a statement prepared by an agent as the appellant’s own. This was interrogation, and thus a failure scrupulously to honor the appellant’s choice not to make the written statement. This analysis again leads us to the conclusion that the statement was involuntary and should have been suppressed.
Improper admission of a confession is subject to harmless error analysis. Fulminante, 499 U.S. at 306-12, 111 S.Ct. at 1262-65. Nonetheless, in this case, we cannot say that the error was harmless. Excepting the fact that a pistol was missing and the appellant along with others had access to it, the written confession was the only evi *660 dence adduced at trial of the appellant’s guilt. Furthermore, for some reason, evidence of the appellant’s oral admissions allegedly made during interrogation was never offered during the trial on the merits. Therefore, the signed statement was not merely duplicative of oral admissions entered into evidence, but rather it was the only evidence of incriminating statements made by the appellant.
Because we find that it was error not to suppress the written confession and that the error was not harmless, we set aside the findings of guilty of Charge III and its specification and, in the interest of judicial economy, order them dismissed. The remaining findings of guilty are affirmed.
SENTENCE REASSESSMENT
This Court has the duty of determining sentence appropriateness, which is “the judicial function of assuring that justice is done and that the accused gets the punishment he deserves.” United States v. Healy, 26 M.J. 394, 395 (C.M.A.1988). “Generally, sentence appropriateness should be judged by ‘individualized consideration’ of the particular accused ‘on the basis of the nature and seriousness of the offense and the character of the offender.’” United States v. Snelling, 14 M.J. 267, 268 (C.M.A.1982) (citation omitted).
The appellant stands convicted of failure to go to his appointed place of duty, wrongful appropriation of a pair of combat boots, and wrongful use of amphetamines/methamphetamines. The record indicates that there is little to mitigate the seriousness of these crimes. The record also indicates the appellant refused to attend Level III drug and alcohol treatment prior to the trial, Pros. Ex. 10, and the appellant’s supervisor rated him at the bottom of the twenty Marines who worked for him. Record at 253.
While the prosecution asked for the maximum sentence, including over fifteen years confinement, the judge awarded one year of confinement, a bad-conduct discharge, forfeiture of all pay and allowances, and reduction to private, pay grade E-l. As already mentioned, the convening authority reduced the post-confinement forfeitures of pay and allowances to $543.00 per month. The appellant has already served all of the confinement. Considering all of the factors in this case, we approve only so much of the sentence as includes a bad-conduct discharge, confinement for one year, and reduction to pay grade E-1.
Judge DOMBROSKI and Judge CLARK concur.

. I. THE CONVENING AUTHORITY ERRED IN APPROVING A BAD-CONDUCT DISCHARGE BECAUSE THE RECORD OF TRIAL DOES NOT CONTAIN THE MILITARY JUDGE’S ESSENTIAL FINDINGS ON THE SUPPRESSION MOTION AND IS, THEREFORE, INCOMPLETE.
II. THE MILITARY JUDGE ERRED IN DENYING APPELLANT’S MOTION TO SUPPRESS HIS 18 MAY 1993 STATEMENT BECAUSE THE STATEMENT WAS INVOLUNTARY.

. The Miranda doctrine was held to be applicable to military interrogations in United States v. Tempia, 16 C.M.A. 629, 37 C.M.R. 249 (1967).