CRAWFORD, Judge
(dissenting):
Appellant’s communications with his pastor were not protected under the clergy privilege. And, even if they were, his subsequent confessions to law enforcement and social work personnel were totally independent of the statements to the pastor. Thus, I respectfully dissent from the majority’s misapplication of Military Rule of Evidence (M.R.E.) 503, Manual for Courts-Martial, United States (2005 ed.) (MCM),[1] and assuming there was a violation of M.R.E. 503, its failure to follow precedent of the Supreme Court and this Court concerning the attenuation of any taint.
BACKGROUND
Appellant’s wife became suspicious of Appellant when her daughter told her “Daddy says ... no more tongue in teeth” when kissing. Later, the child was behaving oddly and told her mother that Appellant “pointed down there and asked her to kiss” him on his genitalia area. When his wife confronted Appellant, he denied it. Mrs. Shelton then told Appellant she was going to call their pastor, Reverend (Rev.) Dennis. Shortly after the confrontation, Mrs. Shelton called Rev. Dennis for guidance.
Rev. Dennis told Mrs. Shelton to tell Appellant he wanted to talk to him and to have Appellant come to see him the following evening at 8:00 p.m. Rev. Dennis’s purpose was to find out the truth about the allegations. Mrs. Shelton told Appellant about the meeting and he arrived as directed. Appellant acknowledged he was not seeking a meeting with Rev. Dennis and that he was responding to Rev. Dennis’s direction.
Although not certain of the purpose of the meeting, Appellant suspected it was to discuss the allegations his wife raised with him regarding his stepdaughter. Appellant realized that ultimately he would have to tell his wife what had happened with his stepdaughter, but it was not his plan to tell her at that time. Appellant also did not plan on admitting his misconduct to Rev. Dennis at the meeting. Appellant testified he went to the meeting because his pastor “asked to meet with [him] and [he] always went if [his] pastor ever wanted to meet with [him].” He acknowledged he could have chosen not to go to the meeting, however, he thought it would have been disrespectful to Rev. Dennis not to respond.
The meeting took place in a two-bedroom house located on the church property and routinely used as a nursery. Rev. Dennis also used this building for meetings with church members. The area used for the meeting was set up similar to a living room with sofas. Rev. Dennis was dressed in slacks, a dress shirt, and jacket, which was typical attire for him when not presenting a sermon.
When Appellant entered the room, Rev. Virgo was in the room with Rev. Dennis.[2] Rev. Dennis did not introduce Rev. Virgo to Appellant and Appellant did not question his presence. According to Appellant, it was common practice for another preacher to be present in counseling sessions.
The meeting started with Rev. Virgo leading the three men in a prayer. Immediately after the prayer, Rev. Dennis got to the point of the meeting. He told Appellant that his wife had called him and said that something very serious had happened at home. Rev. Dennis told Appellant that he wanted to know the truth and that God would judge Appellant if he lied. Appellant readily admitted he had engaged in inappropriate con *42 duct with his stepdaughter and had fantasies of taking the contact with his stepdaughter to another level. Rev. Dennis told Appellant his conduct was wrong and that he could go to jail for this.
Rev. Dennis then told Appellant that he needed to tell his wife the truth about what had occurred with his stepdaughter. There was no discussion about why Appellant’s wife needed to know the truth. He told Appellant to go get his wife and bring her back to the meeting. Appellant left the meeting, went to his home to pick up his wife, and returned to the meeting within fifteen to twenty minutes.
Appellant and his wife sat down in the room with Rev. Dennis and Rev. Virgo. Rev. Dennis told Appellant “you need to talk to her. Tell her exactly what happened.” Appellant responded, “I did it. I did it. I’m wrong. I did it.” He also stated, “that’s not the way I want to be____” It appears that neither Rev. Dennis nor Appellant repeated the details of Appellant’s initial confession of his actions and fantasies to Appellant’s wife.
During the conversations with Appellant, Rev. Dennis told the parties present that the situation was serious, it needed to be reported, something had to be done, and Appellant could go to jail. At no time did Appellant object to or oppose reporting his misconduct. Rev. Dennis told the Sheltons during the meeting that state law required clergy to report any type of crime against children.[3] At the conclusion of the meeting, Rev. Dennis proceeded to address what to do next. He expressed concern for the safety of Appellant’s stepdaughter and recommended that Mrs. Shelton leave the home with her children. Mrs. Shelton said she would keep her daughter away from Appellant. The entire meeting process, including the time it took for Appellant to go home and pick up his wife, lasted approximately one hour and fifteen minutes. The Sheltons left the church at 9:00 p.m. or 9:15 p.m.
Even though Appellant did not want his wife to know about his actions at that time, he left the meeting, picked up his wife and brought her back to the church to talk to Rev., Dennis. Appellant said he knew his admissions would not be held confidential “when [Rev. Dennis] told my wife, and then the meeting afterwards he informed me and my wife that according to the bylaws that— that he would have to tell the proper authorities.” He also testified he was not using Rev. Dennis “to come clean” with his wife or to turn himself in for his misconduct. When Appellant decided to meet with Rev. Dennis, he did not plan or intend to acknowledge or talk about his actions with his stepdaughter.[4] Rev. Dennis confronted Appellant about the allegations raised by Appellant’s wife and Appellant confessed.
Approximately two weeks later, Rev. Dennis saw Appellant’s wife at church and asked if she was going to report what happened. Rev. Dennis told her he was obligated to report it to the proper authorities and advised her to do the same. Rev. Dennis never reported Appellant’s misconduct to authorities. On June 24, 1999, Appellant’s wife contacted Ms. Sandi Doyle, a social worker at Fort Lewis. Appellant’s wife told Appellant she had contacted Social Work Services. Ms. Doyle contacted the Criminal Investigative Division (CID), which contacted Appellant’s chain of command. On June 24, 1999, Appellant was ordered to report to CID. After a prpper rights advisement, Appellant made a sworn statement admitting his misconduct with his stepdaughter.[5] The *43 following day, Appellant went to Social Work Services to meet with Ms. Doyle for an appointment. Appellant talked about his actions in general terms with Ms. Doyle. She then set up an appointment for him with Mr. Michael Comte, a psychotherapist. Appellant discussed with Mr. Comte the details of his misconduct and fantasies. By the time the appointment was set up with the psychotherapist, Appellant wanted to meet with Mr. Comte to get assistance for himself. Appellant acknowledged that his communications to Mr. Comte were not connected to what he had said to CID.
DISCUSSION
M.R.E. 503(a) provides that the holder of a privilege may “prevent another from disclosing a confidential communication by the person to a clergyman ... if such communication is made either as a formal act of religion or as a matter of conscience.” M.R.E. 503(b) defines “clergyman” and then expressly limits the term “confidential communication.” “[Communication is ‘confidential’ if made to a clergyman in the clergyman’s capacity as a spiritual advisor ... and is not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the purpose of the communication or to those reasonably necessary for transmission of the communication.” M.R.E. 503(b)(2).
This Court has adopted the three-prong test identified in United States v. Moreno, 20 M.J. 623, 626 (A.C.M.R.1985),[6] to determine whether communication to a clergy is privileged and thus, protected from disclosure. One claiming the clergy privilege must establish:
(1) the communication must be made either as a formal act of religion or as a matter of conscience;
(2) it must be made to a clergyman in his capacity as a spiritual advisor or to his assistant in his official capacity; and
(3) the communication must be intended to be confidential.[7]
Applying this analysis to the facts in this case, I would not hold that a clergy privilege existed.[8] Specifically, I would not conclude that Appellant confessed his actions and fantasies to Rev. Dennis and Rev. Virgo and subsequently to his wife as a matter of conscience or that Appellant “intended” the communication to be “confidential.”[9]
A MATTER OF CONSCIENCE
Appellant’s confessions to Rev. Dennis, Rev. Virgo, and Mrs. Shelton do not amount to a “matter of conscience.” The clergy “privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return.” Trammel v. United States, 445 U.S. 40, 51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980).
The facts in this case do not support a finding that Appellant was seeking out Rev. Dennis for any kind consolation or guidance. Appellant did not request a meeting. Rev. Dennis told Appellant to come to see him. Rev. Dennis set up the meeting to find out the truth of the allegations raised by Mrs. Shelton and to determine if the safety of Appellant’s stepdaughter was an issue. Mrs. Shelton was the one seeking out Rev. Dennis’s assistance, not Appellant. Moreover, Rev. Dennis sought out Appellant. This is not a situation where a penitent is seeking to confess his sins to obtain forgiveness or guidance. In sum, these facts do not amount to an individual seeking to talk to a member of the clergy “as a matter of conscience.”
Appellant claimed he confessed because he did not “want the judgment of God” on him and he was hoping Rev. Dennis would “tell [him] how [he could] get back in favor with God, and maybe could even tell [him] some *44 place [he] could go to find help.” However, Appellant’s actions, or lack of actions, do not support Appellant’s assertion that he was seeking consolation or help for repentance. During the meeting, and during the days following the meeting, Appellant did not ask for a subsequent or follow-up meeting for consolation or counseling with Rev. Dennis or other members of the clergy, nor did he seek or ask about referrals to other professionals who could help him. Further, during the meeting, Appellant did not ask for prayer for himself or his family.[10] He also did not ask God for forgiveness through prayer or through Rev. Dennis. He did not ask his wife for forgiveness or promise to try to get help in dealing with his conduct and proclivities.
Appellant was not “in need.” If anyone was seeking help or consolation, it was Appellant’s wife. Mrs. Shelton was seeking help from Rev. Dennis to find out the truth from Appellant regarding her daughter’s statements and actions.
None of the reasons for the applicability of the clergy privilege is present in this case. Appellant was not seeking help or consolation from Rev. Dennis. As the military judge correctly concluded, “the [Appellant’s] motivation in agreeing to meet [Rev.] Dennis was not for the purpose of seeking the clergyman’s spiritual guidance or as a matter of conscience.”
COMMUNICATION MUST BE INTENDED TO BE CONFIDENTIAL
The totality of the circumstances surrounding the disclosure do not support Appellant’s assertion that the conversation with Rev. Dennis was intended to be “confidential.” I agree that “[w]hether a communication is confidential will depend on the intent of the person making the communication,” however, a military judge or court must look at the “circumstances, timing, and location of the communication” to determine the actual intent of that person.[11]
From the beginning, Rev. Dennis made it very clear the situation was serious and needed to be reported. He told both Appellant and his wife that Appellant could go to jail for his actions towards his stepdaughter. He also told Appellant he needed to tell his wife the truth and he directed Appellant to go pick her up and bring her back to the meeting. Appellant left the meeting, went home to pick up his wife, and returned to the meeting within fifteen to twenty minutes. Appellant never disputed or openly argued against “reporting” the situation or to “telling” his wife. Appellant never asked that Rev. Dennis not involve anyone else in the situation.[12] It is unreasonable, based on what was being said and done during the meeting to conclude that Appellant perceived *45 his statements acknowledging misconduct amounted to “a confidential disclosure” to a member of the clergy. The fact that Appellant readily went to pick up his wife and returned to Rev. Dennis’s office with her so that he could “tell” her the truth is inconsistent with Appellant’s assertion that he believed his confession would not be disclosed or kept secret. Even assuming Appellant expected his conversation with Rev. Dennis and Rev. Virgo to be held in confidence, once he told his wife and allowed Rev. Dennis to tell his wife about his confessed misconduct, there was no longer a realistic expectation of privacy.
If Appellant expected or intended confidentiality, he did not say so at the time and never responded to what was being said to him by Rev. Dennis. It is clear from Rev. Dennis’s comments and actions that he did not intend to keep this information confidential. Appellant never questioned or challenged this intent. Conveniently, at the Article 39(a), UCMJ, session, Appellant testified that he believed his confession would be confidential. This Court now finds that testimony more credible than the military judge’s findings regarding Appellant’s and Rev. Dennis’s credibility.[13] Contrary to Appellant’s assertions at trial and the findings by the majority, the facts do not support the conclusion that Appellant was seeking to make his admission of wrongdoing confidential.
In addition, Appellant failed to establish that the presence of Rev. Virgo, and subsequently his wife, during his communications with Rev. Dennis were essential to, or in furtherance of, the purpose of the communication to a clergy member. Generally, the existence and applicability of the clergy privilege is undermined by the presumption “that communications that take place in the presence of third parties are not confidential.” In re Grand Jury Investigation, 918 F.2d 374, 385 n. 15 (3d Cir.1990).[14] Although the privilege may exist even if third persons are present or later hear the communication, the disclosure must be “in furtherance of the purpose of the communication or to those reasonably necessary for the transmission of the communication.” M.R.E. 503(b)(2). The burden of proof to establish the existence of the privilege and to rebut the presumption is on the party asserting the privilege. In re Grand Jury Investigation, 918 F.2d at 385.
In this case, a third person, Rev. Virgo, was present during Appellant’s initial confession to Rev. Dennis and during Appellant’s admission to his wife. Appellant did not know Rev. Virgo and was not introduced to him at the time of the meeting as someone who needed to be present in order to facilitate the process or the communication. No one asked Appellant’s permission to have Rev. Virgo present during his discussion with Rev. Dennis and Appellant did not voice an objection to having a person he did not know present during his conversation. Although Rev. Virgo apparently led the group in prayer as the meeting began, he did not participate in the questioning of Appellant or any counseling. He simply served as a witness to what was transpiring. Appellant had no expectation of receiving anything, including consolation from Rev. Virgo. Rev. Virgo did not further the purpose of the communication and his presence was not reasonably necessary for the transmission of the communication.
After Appellant confessed to Rev. Dennis in the presence of Rev. Virgo, Rev. Dennis told Appellant to go get his wife and bring her back. Rev. Dennis also told Appellant he should tell his wife the truth about what he did to his stepdaughter. Appellant *46 brought his wife back to the meeting with Rev. Dennis and Rev. Virgo. At that time, Appellant acknowledged that he acted inappropriately with his stepdaughter. Making Appellant tell his wife the truth was not in “furtherance of the purpose of the communication” and was not “reasonably necessary for the transmission of the communication.” See M.R.E. 503(b)(2). Telling his wife “the truth” was also not necessary for consolation or to help Appellant. And, contrary to the assertion of the majority, telling his wife was not necessary for Appellant’s “redemption.” There were no follow-up meetings or counseling sessions scheduled for Appellant individually, or with his wife. There were no recommendations or referrals to mental health professionals. Rev. Dennis made Appellant tell his wife the truth to confirm her suspicions about Appellant. Presumably, he also made Appellant tell his wife to prevent Appellant from committing additional misconduct with his stepdaughter and to protect her.[15] There was no other purpose for communicating Appellant’s misdeeds to Mrs. Shelton. In short, telling Mrs. Shelton was not to help Appellant in any way.[16] Appellant failed to demonstrate that the communications to Rev. Virgo or his wife were in furtherance of the purpose of the communication or that their presence was necessary for the transmission.
MILITARY JUDGE’S ESSENTIAL FINDINGS
The majority believes the military judge erred in concluding that Appellant’s communieation with Rev. Dennis was not “a matter of conscience.” The majority opinion determined that the military judge abused his discretion because he “misconstrued” the clergy privilege and gave more weight to Rev. Dennis’s opinions versus the opinions of Appellant.[17]
The military judge did look at Appellant’s “opinion” and determined whether Appellant intended for the communication to be a confidential “matter of conscience.” The military judge, however, did not limit his fact-finding merely to Appellant’s words. He looked at the credibility of the witnesses and the “circumstances, timing, and location of the communication” to make “independent conclusions” regarding the existence of the privilege. He also looked at what was being said and done at the time of the communication to determine Appellant’s actual intent. If Appellant disagreed, or truly intended not to have his confession disclosed, he should have at least said something to that effect. The majority relies on Appellant’s spoken words during the motion hearing and what they perceive as a coercive “religious atmosphere” to determine the actual intent of Appellant.[18]
The majority finds that Appellant confessed to Rev. Dennis “as a matter of conscience” by focusing on the “religious atmosphere” surrounding the conversations, as well as Rev. Dennis’s use of God to cause Appellant to feel guilt and shame and thus confess. Accordingly, the majority equates this potentially “coercive” environment to Appellant having an intent to confess his actions and *47 fantasies “as a matter of conscience.”[19] In his findings, the military judge clearly looked at and considered Appellant’s intent as to why he selected this moment in time to confess and whether he was seeking consolation, assistance, or forgiveness from his God.[20] The military judge’s findings are correct. Appellant did not seek to confess his misconduct as a “matter of conscience” or as “a formal act of religion.” Appellant never spoke up or took any actions to demonstrate a different conclusion as to his “intent.”
In its opinion, the majority comments that the military judge prepared his “formal written ruling” on the motion to suppress nine months after the trial. The majority seems to infer that the military judge acted inappropriately by submitting his written findings after the trial. After this lengthy verbatim record was prepared and given to the military judge, he prepared his factual findings.[21] See 1 Francis A. Gilligan & Fredric I. Lederer, Court-Martial Procedure § 14-64.30, at 584 n. 245 (2d ed. Supp.2004).[22]
How rulings are entered in trials by courts-martial varies according to the circumstances of the case, local resources, and local practice. Most rulings on simple evidentiary objections are entered orally on the record at the time the objection is made. As to motions to suppress and motions in limine, some military judges enter their ruling and essential findings orally or in writing on the record contemporaneously. Others enter their ruling orally, followed by written essential findings. In any case, in view of the Rules for Courts-Martial ..., divers local practices and customs, and the absence of any trial court rules before us, we cannot lay down any hard and fast rule on how rulings on suppression motions are made at trial. Instead, we must give weight to the local practice and to the intentions of the military judge as manifested by his action on the record of the particular ease.
United States v. Flores-Galarza, 40 M.J. 900, 906 (N.M.C.M.R.1994).[23]
Our justice system places a lot of responsibility and trust in our military judges. Unless the evidence shows otherwise, we should not assume military judges will take the opportunity to prepare essential findings after a ruling as a post hoc rationalization for the ruling. In light of the fact that a military judge can reconsider his findings on all motions except findings of not guilty before authentication of the record, we cannot over *48 react to military judges who pen their findings after trial but before authentication. The majority seems to overlook the fact that the military judge made his ruling on the record and summarized the basis for his ruling at that time. Since this motion was the focus of the conditional plea, it is likely the military judge wanted to put his findings in a more formal format. The critical point, however, is that the military judge made his essential findings of fact before authentication of the record.
Additionally, I notice a disturbing trend by the majority. In United States v. McNutt,[24] this Court considered as fact what the court below considered arguendo. In United States v. Harvey, 64 M.J. 13, 25 (C.A.A.F.2006) (Crawford, J., dissenting), this Court converts what purports to be a statement of counsel into evidence to reach its conclusion. Finally, in United States v. Warner,[25] this Court considered a very lengthy appellate exhibit as facts, and yet, this Court now implies that it was somehow improper for the military judge to see the record before making his formal findings.
ATTENUATION
Assuming that the clergy privilege applies in this ease, the parties recognized at trial that Appellant made additional statements to others regarding the abuse of his stepdaughter. The defense argued at trial that these statements should also be excluded because they were “made only because there had been a breach of the clergyman-penitent privilege----” The defense motion that Appellant’s conditional plea sought to preserve clearly extended to suppression of “any and all evidence seized, collected, and developed as result of the breach of his confidential communication to his pastor____” Nevertheless, the issue before the military judge, the CCA, and this Court, does not preclude the conclusion that the “evidentiary error” regarding the privileged communication was harmless since Appellant’s statements to the CID agent and the psychotherapist were attenuated and prove Appellant’s guilt. See Moreno, 20 M.J. at 627 (“An error not of constitutional dimension may be found harmless if the fact finder was not influenced by it or if the error had but a slight effect on the resolution of the issues in the case.”).
As evidenced by the facts in the record of trial, Appellant’s subsequent statements were attenuated from the initial confession to Rev. Dennis and Appellant’s wife. Seventeen days after Appellant spoke to Rev. Dennis, he made a sworn statement to CID after being properly advised of his rights and waiving them. At the time of this statement, he was not bullied or threatened in any way.
In the past, a conditional plea did not preclude this Court from examining any derivative evidence or a secondary basis for affirming the ruling on the motion. See, e.g., United States v. Robinson, 58 M.J. 429, 432-34 (C.A.A.F.2003) (in a conditional plea case, the Court went beyond the question of probable cause and examined a secondary basis in upholding the investigative stop — reasonable suspicion); United States v. Lichtenhan, 40 M.J. 466, 469-70 (C.M.A.1994) (in a conditional plea case, this Court held that the subsequent statement to the Naval Investigative Service was admissible and not tainted by the prior, unwarned statement). The majority’s reliance on United States v. Barror, 23 M.J. 370 (C.M.A.1987), is also misplaced. In that ease, this Court concluded that the government’s only significant evidence of the appellant’s guilt was not admissible and, as a result, the government had no other “legally competent evidence” available to establish the appellant’s guilt. Id. at 373. In this case, there were at least three other statements by Appellant to three different individuals.[26] These statements were made by Appellant seventeen days after his statements to his wife and Rev. Dennis and, thus, any potential taint had dissipated. In addition, the Government had the statements by Ap *49 pellant’s stepdaughter to Mrs. Shelton and Mrs. Shelton’s observations of her conduct. With this other evidence, the Government could meet its burden of proving Appellant’s guilt with “legally competent evidence.”
Once again, however, this Court selectively decides when it wants to follow its own precedent. See United States v. Aleman, 62 M.J. 281, 284-85 (C.A.A.F.2005)(Crawford, J., dissenting). In the past, this Court has evaluated the prejudice from erroneous evidentiary rulings by “weighing (1) the strength of the Government’s case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question.” United States v. Kerr, 51 M.J. 401, 405 (C.A.A.F.1999). The other “legally competent evidence” in this ease clearly supports the Government’s burden of proof and a finding of guilty on the affected specifications and charge.
CONCLUSION
Because I would resolve that question in favor of the military judge’s ruling regarding the application of the clergy privilege, I would hold that Appellant did not prevail, that his plea was provident, that Appellant may not withdraw his plea, and that the findings and sentence should be affirmed.

. The current versions of all MCM provisions cited are identical to the ones in effect at the time of Appellant’s court-martial unless otherwise indicated.

. Rev. Dennis routinely trained young, inexperienced preachers in his church and had them present during meetings or other church functions. Rev. Virgo was one of the young preachers Rev. Dennis trained.

. Clergy are not mandated reporters of child abuse in the state of Washington. Wash. Rev. Code Ann. § 26.44.030 (West 2003).

. Appellant testified that "when I first went there I did not — I did not want to tell him anything. I was not going to tell him anything, but after he made the statement to me I thought about it real quick and — and that was when I decided to go ahead and tell him.”

. Special Agent (SA) Proctor of the Fort Lewis CID interviewed Appellant on June 24, 1999, after receiving a call from Ms. Doyle from Social Work Services. She told CID she had information that indicated Appellant may have committed indecent acts with his stepdaughter. SA Proctor did not interview or talk to Mrs. Shelton prior to his interview with Appellant. SA Proctor advised Appellant of his Article 31(b), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 831(b) (2000), rights prior to questioning Appellant. Appellant waived his rights and rendered a sworn statement admitting misconduct with his stepdaughter.

. United States v. Coleman, 26 M.J. 407, 409 (C.M.A.1988).

. Moreno, 20 M.J. at 626 (emphasis added).

. I take issue with the majority’s findings in regard to prongs one and three of the Moreno test. I do not dispute that Rev. Dennis qualifies as clergyman and served as a spiritual advisor.

. I agree with the majority that the facts do not support a finding that Appellant’s communication was a "formal act of religion.” Thus, I will not address this factor.

. According to Appellant, the Bible says that "one part of forgiveness is that we have to confess our sins while in praying to Jesus

. 2 Stephen A. Saltzburg et al., Military Rules of Evidence Manual § 502.02, at 5-25 (5th ed.2003). See also id. § 503.01, at 5-37 ("[T]he definition [of confidential communications] turns on the penitent's intent and is broad enough to include oral and written statements if made to the clergyman in confidence for the purpose of seeking spiritual counseling. If the statements were made for non-spiritual purposes, the privilege does not exist.").

. Rev. Dennis testified that he "taught” all church members in open meetings that if they came to him with a matter they wanted him to keep confidential, they had to state that to him. He also specifically told the members of his church that there would be no confidentiality if a crime was committed. Appellant and his wife had been members of Rev. Dennis’s church for more than two years. The Sheltons also attended a church pastored by Rev. Dennis at a previous duty assignment in Georgia. Appellant and Mrs. Shelton testified at the Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), session that they did not recall being told prior to the meeting that if a member revealed a crime to Rev. Dennis, he would not consider the communication confidential. They also claimed they did not recall being told that they had to request the communication be held in confidence before they could expect confidentiality. Both recall Rev. Dennis discussing with them at the meeting that “by law” he was required to report the incident to authorities. There is some confusion in the testimony and in the military judge’s findings as to whether Rev. Dennis believed he was required to report child abuse “by state law” or based on the "by-laws” of the church. Rev. Dennis's testimony clarifies that he is referring to state law and not church "by-laws.”

. On the credibility issue, the military judge believed Rev. Dennis, rather than Appellant, and found that the "discussion[s] between [Rev. Dennis] and the accused were not meant to be confidential....” See United States v. Martinez, 38 M.J. 82, 86 (C.M.A.1993) (military judges are in the unique position to decide the appropriate weight to give to the testimony of witnesses and when “the military judge expresses special influence of that unique viewpoint on his judgment,” that should weigh heavily in the appellate court’s determination).

. “[I]n a situation where numerous persons, each seeking individual spiritual guidance, choose to meet as a group with a clergy member, a privilege does not exist unless, upon independent scrutiny, the ‘essentiality and in furtherance’ test is met.” In re Grand Jury Investigation, 918 F.2d at 386 n. 19.

. Arguably, the purpose of the communication to Mrs. Shelton was necessary to protect Appellant’s stepdaughter from further harm and exposure to Appellant. However, protection of Appellant’s stepdaughter could have been accomplished without having Appellant confess his actions to his wife.

. Compare United States v. Isham, 48 M.J. 603, 607-08 (N.M.Ct.Crim.App.1998) (Court concluded that the appellant agreed to disclosure by "a” chaplain for the limited purpose of getting help for the appellant and preventing him from carrying out threats to harm himself and others. The disclosure was for a limited purpose of getting the appellant help and not for disclosure at a court-martial.).

. Appellate courts presume that military judges know the law and apply it correctly. United States v. Raya, 45 M.J. 251, 253 (C.A.A.F.1996); United States v. Prevatte, 40 M.J. 396, 398 (C.M.A.1994).

. Anderson v. Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (If the military judge’s "account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse it even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.”).

. The military judge was not asked to determine whether Appellant’s confession was involuntary based on the coercive "religious atmosphere,” however, and the majority seems to have raised and resolved the issue on behalf of the defense under the guise of the clergy privilege.

. The military judge stated in his findings on the motion: (1) that Appellant did not intend for the communications to be confidential; (2) that had he intended that the communications be confidential he would not have spoken with Rev. Virgo present or brought his wife back to Rev. Dennis’s office; (3) that Appellant's motivation in agreeing to meet Rev. Dennis was not for the purpose of seeking spiritual guidance or as a matter of conscience; and (4) that Appellant never asked for spiritual guidance, absolution, or God’s forgiveness.

. R.C.M. 905(d) ("Where factual issues are involved in determining a motion, the military judge shall state the essential findings on the record.”). See also United States v. Doucet, 43 M.J. 656, 659 (N.M.Ct.Crim.App.1995) (Although the court urged the importance of entering essential findings contemporaneously with the ruling, the court noted that “[t]he usual remedies for a failure [of the military judge] to enter the required essential findings are a rehearing or return of the record of trial to the military judge for entry of the essential findings.").

. See also R.C.M. 905(f) (permitting reconsideration by the military judge of any ruling, other than one of "not guilty,” prior to authentication of the record of trial); United States Army, Trial Judiciary Standard Operating Procedure, Chap. 18, para. 11 (May 1, 2003) (explaining that "[i]f special or essential findings are made in a memorandum format, the memorandum must be appended to the record of trial as appellate exhibit before authentication.”)

. But cf. Flores-Galarza, 40 M.J. at 906 n. 9.
[T]he most important value of making essential findings contemporaneously with the ruling is the discipline it affords the decision maker and the integrity it brings to the decision-making process. If essential findings are prepared after the ruling, they may become nothing more than a post hoc rationalization. Hence, the far better practice is to enter the ruling and essential findings contemporaneously.

Id.

. 62 M.J. 16, 24-25 (C.A.A.F.2005) (Crawford, J., concurring in part and dissenting in part).

. 62 M.J. 114, 124 (C.A.A.F.2005) (Crawford, J., dissenting).

. Appellant made some general admissions to the social worker, Ms. Doyle. He also made detailed admissions to SA Proctor of CID and to Mr. Comte, the psychotherapist.