UNITED STATES, Appellee

v.

Thomas C. FLESHER, Specialist
U.S. Army, Appellant

No. 13-0602

Crim. App. No. 20110449

United States Court of Appeals for the Armed Forces

Argued February 24, 2014

Decided July 8, 2014

OHLSON, J., delivered the opinion of the Court, in which ERDMANN
and STUCKY, JJ., joined.  BAKER, C.J., and RYAN, J., each filed
separate dissenting opinions.

Counsel

For Appellant:  Captain Robert N. Michaels (argued); Lieutenant
Colonel Jonathan F. Potter and Major Amy E. Nieman (on brief);
Captain J. Fred Ingram.

For Appellee:  Captain Daniel H. Karna (argued); Colonel John P.
Carrell, Lieutenant Colonel James L. Varley, and Major Robert A.
Rodrigues (on brief).

Military Judge:  Gregory A. Gross

**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

Judge OHLSON delivered the opinion of the Court.

We granted review in this case to determine whether the military judge abused his discretion when he allowed a putative expert witness to testify at trial. Under the unusual set of circumstances present in this case, we conclude that the military judge did abuse his discretion by admitting this testimony, and that this error likely had a substantial influence on the panel members' findings.

In the summer of 2010, Appellant was a specialist in the U.S. Army and lived in on-base housing at Dugway Proving Ground in Utah. A family with two teenage children -- a sixteen-year-old girl (S.A.) and her younger brother -- lived across the street. The Government alleged at trial that on June 29, 2010, Appellant invited these two teenagers to his home and plied them with alcohol. They became intoxicated and eventually returned to their own home and went to bed. After midnight, Appellant went to the teenagers' house and crawled in the bedroom window of the sleeping S.A. without her knowledge or permission. She awoke to find Appellant removing her pants. Appellant then pressed his body against S.A., covered her mouth with his own, and held down her wrists as he proceeded to engage in nonconsensual sexual intercourse with her. S.A. later stated that although she struggled with Appellant she did not fight back more fiercely or call out for help because she was drunk,

2

confused, scared, and embarrassed. Appellant ultimately left the home without anyone other than S.A. knowing of his presence. S.A. telephoned a friend about thirty minutes after the incident, however, and the next morning this friend and the friend's mother notified local law enforcement.

In contrast to the Government's version of events, Appellant testified that S.A. had invited him to come to her bedroom on the night in question and that the sex was consensual. In seeking to corroborate the consensual nature of the encounter, defense counsel established through the combined testimony of several witnesses that S.A.'s brother was sleeping in an adjoining room -- with the door between these two rooms ajar -- and yet S.A. did not alert her brother to Appellant's presence. During closing arguments, defense counsel also pointed out that even after Appellant had left the premises, S.A. did not immediately notify her parents or the police about the alleged sexual assault. Appellant also testified that S.A. had a motive for falsely accusing him of sexual assault, noting that he had told her of his disapproval of her drug use, and she may have been afraid that he would report this illegal activity to her parents.

At his court-martial, Appellant was charged with aggravated sexual assault, burglary, and two specifications of furnishing alcohol to a minor, in violation of Articles 120, 129, and 134,

Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 929, 934 (2006).  Appellant pleaded guilty to the latter two specifications involving the alcohol, but not guilty to the other two charges.  A general court-martial with enlisted members eventually found Appellant not guilty of the burglary charge but guilty of the sexual assault charge.  The panel sentenced Appellant to confinement for seven years, forfeiture of all pay and allowances, reduction to the grade of E-1, and a dishonorable discharge.  The convening authority approved the sentence as adjudged.  Upon review, the United States Army Court of Criminal Appeals (CCA) affirmed the findings of guilty and the sentence.  United States v. Flesher, No. ARMY 20110449, slip op. at 1 (A. Ct. Crim. App. May 30, 2013).

In the course of the trial, the military judge permitted the Government to call a Sexual Assault Response Coordinator (SARC) as an expert witness.  The Government represented to the military judge that the purpose for calling the SARC was to elicit testimony that, based on her work with thousands of sexual assault victims, it is common for sexual assault victims not to fight back against their attacker, not to scream or call for help, and not to first report the sexual assault to the police rather than to a friend or family member.  However, the military judge did not handle in a textbook manner the issues of whether the SARC was truly an expert, the subject and scope of

her testimony, whether her testimony in this case was relevant and reliable, and whether its probative value outweighed its potential prejudicial effect.  Further, when the SARC's testimony blatantly exceeded the scope of that which had been approved by the military judge, the trial counsel took no action to rein her in and the military judge provided no curative instruction to the panel.

It is the testimony of this putative expert that is the crux of the matter before us.  Specifically, on Appellant's petition we granted review of the following issue:

> Whether the military judge abused his discretion when he admitted the testimony of a putative expert witness in violation of the Military Rules of Evidence and case law on bolstering, expert qualifications, relevance, and the appropriate content and scope of expert testimony.

As explained in greater detail below, we find that the military judge did abuse his discretion in handling this matter, and that this error was prejudicial to Appellant.  Accordingly, we affirm in part and reverse in part.

### BACKGROUND

On May 19, 2011, two weeks prior to the beginning of Appellant's court-martial, the Government provided defense counsel with a witness list.  This list included Ms. Sarah Falk, a former SARC at Fort Carson, Colorado.  However, the Government did not identify Ms. Falk other than to note her current place

5

of employment.  Defense counsel contacted Ms. Falk and interviewed her.  Defense counsel then contacted trial counsel to ask if he intended to call Ms. Falk as an expert witness. Based on these conversations, defense counsel moved for a continuance, noting the recent notification of the Government's intent to call an expert witness and arguing that the defense needed more time to prepare for Ms. Falk's expected testimony. The Government opposed the defense's motion via e-mail to the military judge, stating that Ms. Falk would not interview the victim or testify about the "psychology of trauma," but instead would testify about the "common behaviors and responses" of sexual assault victims.  The defense filed a reply brief the next day.  In this reply, the defense specifically asked for a hearing pursuant to Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), because Ms. Falk's testimony appeared to "lack any scientific methodology."[1]

---

[1] In Daubert, the United States Supreme Court held that a trial judge has a special obligation to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." 509 U.S. at 589.  This "gatekeeping" requirement, as it is called, is intended to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999).

Two days later the military judge sent an e-mail to counsel on both sides.  In the e-mail the military judge addressed the defense's request for a continuance:

> Re:  the Defense motion for a continuance -- As I understand the issue, Ms. Falk is going to testify she has seen lots of alleged sexual assault victims. Some act this way, some act that way, and the way some alleged victims act might not be consistent with how one would think they would act.  Is this correct, Gov't?  If so, Defense, I would guess that Ms. Falk will agree on cross that there is no usual way alleged victims react.  Each alleged victim is different.  I would also think you could get any [Sexual Assault Nurse Examiner] (for example) between now and next week to come in and testify to that.  It doesn't take any preparation.  If I am correct in all of this, why do you need a delay?

This e-mail from the military judge did not address the question of the admissibility of Ms. Falk's testimony; it merely assumed it.  The military judge also failed to explicitly rule one way or another on the Motion for Continuance.

Defense counsel responded via e-mail and reiterated the defense's contention that Ms. Falk's testimony was "not proper expert testimony."  Defense counsel again requested "a Daubert hearing regarding [Ms. Falk's] methodology before she be allowed to testify as an expert on the behaviors of the alleged rape victims."  He also requested discovery from Ms. Falk.

The next day the military judge sent another e-mail.  In response to the defense's request for a hearing and discovery he wrote:

Regarding Ms. Falk: Defense, you can interview her for that information. I will consider any motions or arguments you present, but it is unlikely we will have a Daubert hearing. The Gov't confirmed my understanding of her testimony. She is simply going to say she has seen the different way alleged victims react.

In response to the military judge's e-mail, on May 28, defense counsel filed a Motion to Compel Expert or to Exclude Expert Testimony. In this motion the defense argued that Ms. Falk's testimony should be excluded pursuant to Military Rules of Evidence (M.R.E.) 402 and 403 because it was not relevant and presented a substantial risk of unfair prejudice that outweighed its probative value. In the alternative, if Ms. Falk's testimony was allowed, the defense asked the court to appoint Dr. Thomas Grieger, a putative expert in counterintuitive behaviors, as an expert for the defense. There is no indication in the record that the military judge took any formal action on the defense's motion to compel Dr. Grieger or exclude Ms. Falk until the morning of trial.

The case proceeded to trial on the original trial date of June 1. The military judge began the court-martial with an Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2012), session. During this session, the military judge put on the record a summary of the e-mails that had been exchanged between the parties as well as the in-chambers conference that had been held that morning pursuant to M.R.E. 802. The military judge explained that he

did not grant the defense's motion for a continuance because he believed that Ms. Falk's testimony would be very limited:

> [M]y understanding was that they were going to ask several things. "Have you observed alleged victims? How many in the past?" And, "Some act this way; some act that way." And, "No two victims are the same." When I sent back the email saying, "Is that correct, Counsel?" they confirmed that is correct. And what I indicated to the defense at that time was, based on that, I was not inclined to grant a continuance . . . .

The military judge further explained that the defense's motion to compel the production of Dr. Grieger was without merit because the Government had provided, in lieu of Dr. Grieger, a Sexual Assault Nurse Examiner (SANE) who could provide the same testimony.[2] When the military judge finished summarizing the past proceedings, both counsel stated that they had no objections to this summary.

At this point, defense counsel requested "the chance to voir dire the expert witness from the [G]overnment before she is brought in front of the panel." This request set off another round of discussions about whether or not the defense's requested expert, Dr. Grieger, was necessary in light of the

---

[2] A SANE is a nurse who has been trained to provide care to victims of sexual assault. A SANE performs a medical examination following the report of an assault, and identifies and documents injuries. A SANE also collects and preserves physical evidence that may be necessary for any judicial proceedings. See The Free Dictionary, http://medical-dictionary.thefreedictionary.com/sexual+assault+nurse+examiner (last visited June 26, 2014).

limited nature of Ms. Falk's expected testimony.  The defense argued that regardless of the terminology used, Ms. Falk would be providing testimony on the counterintuitive behaviors of sexual assault victims.  The defense's position was that such testimony is complex, scientific testimony that requires specialized expertise not possessed by the assigned SANE.  The Government responded that Ms. Falk would not be providing specialized scientific testimony about the operation of a victim's brain, but rather would testify based on her professional experience as a SARC as follows:  "I deal with victims and this is what I see from the whatever many victims I've viewed."  The Government further asserted that its expert witness would testify only "regarding scream, non-stranger, and not reporting to law enforcement."  The following colloquy then ensued:

> MJ:  And my understanding, Government, you are not going to ask your expert about why say, for example, she didn't scream?  My understanding was you were just going to ask her:  How many have you done?  I have seen a hundred.  Is it unusual for an alleged victim not to scream?  No that is not unusual.
>
> ATC: Correct --
>
> MJ:  Not to say this is why they don't scream.
>
> ATC: Exactly, Your Honor.  Just to provide that basis, somebody who deals with --
>
> MJ:  Sure.  Okay.

DC: Your honor, the defense would argue if that's the extent of it, that it would also be irrelevant . . . . What we are interested in is what happened in this case.

ATC: And, Your Honor, if in any[]way the defense case comes up and she didn't scream for her mother or she didn't call 911 immediately, you know, without that testimony we are kind of lost. Our case in chief is defici[en]t without that testimony coming in.

MJ: And, Defense, based on my experience all these experts will say some scream, some don't, some delay reporting, some report immediately, and I would think that the government's expert would admit all that on cross-examination. Say, yeah, some people scream, some don't, some delay reporting, and some don't.

. . . .

. . . But again, Government, your expert is not going to testify about this is why she wouldn't have screamed, or this is why some victims don't scream.

ATC: No, Your Honor.

MJ: She is not going to say any of that.

ATC: That is well beyond her expertise. I mean she could conjecture but it, obviously, wouldn't be the same.

MJ: Right.

After some additional discussion, the military judge ruled on the motion to compel. Relying upon what he had "seen in the past" and the limits on Ms. Falk's expected testimony, the military judge concluded that the SANE assigned to the defense could provide the same assistance as Dr. Grieger. The defense's

motion for its own expert was, therefore, denied.  The questions raised pretrial about the admissibility of Ms. Falk's expert testimony were not addressed at this point except with respect to the military judge's statements concerning the narrow boundaries that he would impose on her testimony.  The military judge made no explicit ruling on the motion to exclude Ms. Falk.

At the close of the Article 39(a), UCMJ, session, trial testimony began with S.A. and her brother.  Defense counsel elicited testimony from both witnesses that S.A.'s brother had a habit of sleeping on the couch outside her room and that on the evening in question he was sleeping there with the door partially open.  Next, the members were excused and another Article 39(a), UCMJ, session was called during which the parties conducted voir dire of Ms. Falk.  In response to questions from defense counsel, Ms. Falk provided the court with the following information:  she had a "sociology based" bachelor's degree that did not involve clinical counseling; she had not conducted any clinical counseling for sexual assault victims, but instead had "advocated for" what she estimated to be a "couple thousand" such individuals; "[m]ore than a third" of these cases had resulted in a court-martial or a civilian trial; "at least a fourth" of those cases had ended in a conviction; she was "confident" that "the majority" of the individuals who stated that they had been sexually assaulted were "telling the truth";

and her role as a SARC was not to investigate allegations of sexual assault but instead to "walk [victims] through the process and ensure they know what their options and resources are."

The military judge then urged trial counsel to "ask the witness the three things I believe you said you were going to have her testify about." Trial counsel reeled off the following list:

> The questions I do intend to ask this witness [are] based on all the victims she has seen; how often does a victim scream or not scream; how often is the most she has seen; and how many fight back or don't fight; how many involve a stranger versus a non-stranger, someone they met at some point in some way; and then how many she's seen where the first report or the first outcry is to law enforcement as opposed to anyone else other than law enforcement.

However, the military judge did not require trial counsel to actually pose any of these specific questions to Ms. Falk, and she provided no answers to them during this Article 39(a), UCMJ, session. The military judge simply asked, "Any other questions based on that?" After a few additional background questions by counsel for both parties, Ms. Falk was excused.

Without hearing Ms. Falk's expected testimony in her own words or any arguments about the admissibility of Ms. Falk's testimony pursuant to the Military Rules of Evidence (M.R.E.) --

or pursuant to the holdings in Daubert or Houser[3] -- and without giving any explanation of his reasoning, the military judge then made his ruling:

> Government, I am going to let you ask three things. The ones about whether or not that most victims put up a fight or not; scream or not; and who their first report is made to, law enforcement or not law enforcement. But I am not going to let you ask about whether or not most cases it is a stranger or not.

Defense counsel objected on the grounds of relevance. The military judge "noted" the objection, but did not sustain or overrule the objection.

When the members returned, the court heard testimony from S.A.'s stepfather, and then Ms. Falk took the stand. Trial counsel reviewed her educational and professional experience, which included a bachelor's degree in law and society, her work towards a graduate certificate in public policy, and both her civilian and military training in "victim services." Ms. Falk testified that she worked previously as the SARC at Fort Carson.

---

[3] In United States v. Houser, 36 M.J. 392 (C.M.A. 1993), we set out six factors derived from the M.R.E. that must be established for expert testimony to be admissible. The Houser factors are: (1) the qualifications of the expert, (2) the subject matter of the expert testimony, (3) the basis for the expert testimony, (4) the legal relevance of the evidence, (5) the reliability of the evidence, and (6) whether the probative value of the testimony outweighs other considerations. Id. at 397. We view Daubert, which was decided two months after Houser, as "providing more detailed guidance on the fourth and fifth Houser prongs pertaining to relevance and reliability." United States v. Griffin, 50 M.J. 278, 284 (C.A.A.F. 1999).

As Ms. Falk explained it, a SARC's job is to "make contact with the victim upon receipt of a report of sexual assault. You walk them through the medical, legal and investigative processes." Ms. Falk testified that she had personally worked with "thousands" of victims of sexual assault. The Government then asked to have Ms. Falk recognized as an expert in "sexual assault victim responses." The defense renewed its objection "as previously stated" to Ms. Falk's admission as an expert. The military judge then said:

> MJ: Ms. Falk will be recognized as an expert in sexual assault -- as a sexual assault response coordinator.
>
> ATC: Thank you, Your Honor.
>
> MJ: Not in sexual assault victim responses or however you put it.

The remainder of Ms. Falk's testimony on direct examination was very limited. The expert testimony at the center of this appeal consists primarily of three short questions and answers:

> Q: . . . In your experience in dealing with victims, how often have you had a sexual assault victim who has fought back against their attacker?
>
> A: Almost never. And it's generally with an unknown subject, with somebody that that person isn't familiar with; it's a stranger.
>
> Q: In your experience in dealing with victims, how often have you had a sexual assault victim who at the time of the assault screamed or called for help?

A:  Again, almost never.  And, you know, they report
    afterwards that generally there is the fear of
    escalating the violence or fear that they are going
    to be harmed even worse than they already are if
    they yell or scream for help or upset the
    individual.

Q:  Okay.  In your experience, how often does a victim
    report first to law enforcement?  The first person
    they call is law enforcement.

A:  I can't think of a specific case where they do
    report specifically to law enforcement.  It's just
    not something common.  They generally are going to
    go to a friend or a family member.

DISCUSSION

I.   Standard of Review

We review de novo the question of whether the military

judge properly performed the required gatekeeping function of

M.R.E. 702.  Griffin, 50 M.J. at 284.  That is, we must

determine de novo whether the military judge "properly followed

the Daubert framework."  Id.  However, we review for abuse of

discretion the decision by the military judge to permit Ms. Falk

to testify as an expert witness, the limitations he placed on

the scope of her permitted testimony, and his enforcement of

those limitations.  United States v. Billings, 61 M.J. 163, 166–

67 (C.A.A.F. 2005).

> A military judge abuses his discretion when his
> findings of fact are clearly erroneous, the court's
> decision is influenced by an erroneous view of the
> law, or the military judge's decision on the issue at

16

> hand is outside the range of choices reasonably
> arising from the applicable facts and the law.

United States v. Miller, 66 M.J. 306, 307 (C.A.A.F. 2008).  "An 'abuse of discretion' exists where 'reasons or rulings of the' military judge are 'clearly untenable and . . . deprive a party of a substantial right such as to amount to a denial of justice'; it 'does not imply an improper motive, willful purpose or intentional wrong.'"  United States v. Travers, 25 M.J. 61, 62 (C.M.A. 1987) (alteration in original) (quoting Guggenmos v. Guggenmos, 359 N.W.2d 87, 90 (Neb. 1984)).

II.  The Record of Trial

We begin by noting that the military judge did not approach his evidentiary rulings in a methodical manner.  Rule for Courts-Martial (R.C.M.) 801(a)(4) says that the military judge "shall . . . rule on all interlocutory questions and all questions of law raised during the court-martial."  R.C.M. 801(f) further states that "[a]ll sessions involving rulings . . . made . . . by the military judge . . . shall be made a part of the record."  R.C.M. 905(d), which governs motions, states that "[a] motion made before pleas are entered shall be determined before pleas are entered unless . . . the military judge for good cause orders that determination be deferred until trial of the general issue or after findings."  R.C.M. 905(d) further states, "[w]here factual issues are involved in

determining a motion, the military judge shall state the essential findings on the record."

We have previously held that objections made at trial may not be "evaded or ignored." United States v. DeYoung, 29 M.J. 78, 80 (C.M.A. 1989). It is the duty of the military judge to "affirmatively" rule. Id.; see also United States v. Mullens, 29 M.J. 398, 399 (C.M.A. 1990) ("We again hold that the military judge is required by Article 51(b) . . . and R.C.M. 801(a)(4) . . . to rule on these objections."). Further, we have previously explained why it is necessary for the military judge to make a clear record. "We do not expect record dissertations but, rather, a clear signal that the military judge applied the right law. While not required, where the military judge places on the record his analysis and application of the law to the facts, deference is clearly warranted." United States v. Downing, 56 M.J. 419, 422 (C.A.A.F. 2002); see also United States v. Winckelmann, 73 M.J. 11, 16 (C.A.A.F. 2013) ("The Court of Criminal Appeals did not detail its analysis in this case; nor was it obligated to do so. Going forward, however, a reasoned analysis will be given greater deference than otherwise.").

However, the reverse is also true. If the military judge fails to place his findings and analysis on the record, less

18

deference will be accorded.  As the United States Army Court of

Criminal Appeals has recognized:

> When the standard of review is abuse of discretion,
> and we do not have the benefit of the military judge's
> analysis of the facts before him, we cannot grant the
> great deference we generally accord to a trial judge's
> factual findings because we have no factual findings
> to review.  Nor do we have the benefit of the military
> judge's legal reasoning in determining whether he
> abused his discretion . . . .

United States v. Benton, 54 M.J. 717, 725 (A. Ct. Crim. App.

2001) (citations omitted).

The predecessor to the United States Air Force Court of

Criminal Appeals has similarly explained the difficulties faced

by an appellate court when the military judge fails to comply

with R.C.M. 905(d).  "Without a proper statement of essential

findings, it is very difficult for an appellate court to

determine the facts relied upon, whether the appropriate legal

standards were applied or misapplied, and whether the decision

amounts to an abuse of discretion or legal error."  United

States v. Reinecke, 30 M.J. 1010, 1015 (A.F.C.M.R. 1990), rev'd

on other grounds by United States v. Strozier, 31 M.J. 283

(C.M.A. 1990); see also United States v. Doucet, 43 M.J. 656,

659 (N-M. Ct. Crim. App. 1995) ("When factual issues are

involved in ruling on a motion, a trial judge has a mandatory

sua sponte duty to state the 'essential findings' on the record which support his or her ruling." (citations omitted)).[4]

Here, the military judge delayed ruling on the defense's request for a continuance and the defense's motion to compel Dr. Grieger until the morning of trial, denied the motion to compel based on his experience in other cases rather than strictly on the facts of this particular case, did not affirmatively address the defense's request for a Daubert hearing, did not address the Houser factors, did not explicitly deny on the record the defense's motion to exclude the testimony of Ms. Falk, did not provide any findings of fact, and did not apply the law to the facts to support his decision to admit Ms. Falk's expert testimony. Of these concerns, the most important is the fact that the military judge did not conduct even a rudimentary Daubert hearing -- despite the fact that the defense specifically and repeatedly requested one -- or even briefly address the various Houser factors. As a result, we are left with a limited understanding of the military judge's decision-

---

[4] While this Court has not had occasion to discuss the importance of a complete and detailed record in the context of a Daubert analysis, this issue has arisen in the federal courts of appeals. As the United States Court of Appeals for the Tenth Circuit explained, "For purposes of appellate review, a natural requirement of [the gatekeeping] function is the creation of 'a sufficiently developed record in order to allow a determination of whether the district court properly applied the relevant law.'" Goebel v. Denver & Rio Grande Western R.R. Co., 215 F.3d 1083, 1088 (10th Cir. 2000) (citations omitted).

making process and, accordingly, we give his decisions in this case less deference than we otherwise would.

To be clear, we do not hold that a military judge is always required to conduct a formal Daubert hearing or to precisely address each of the factors spelled out in Houser when deciding whether and how a proffered expert should testify. United States v. Sanchez, 65 M.J. 145, 149 (C.A.A.F. 2007) (quoting Daubert, 509 U.S. at 594). "The inquiry is 'a flexible one.'" Id. Further, in regard to our de novo review of the process in the instant case, because the military judge did permit voir dire and placed substantial limitation on the expert testimony, we ultimately conclude that the military judge did perform an adequate, if not exemplary, preliminary gatekeeping inquiry. Nevertheless, we find that the analytical structure developed in the Houser and Daubert cases is quite helpful -- both at the trial and at the appellate level -- in determining the appropriateness of admitting expert testimony. Therefore, we use that structure below in deciding the issue before us. Moreover, we note that when a military judge does not hold a Daubert hearing and does not address the Houser factors in some manner, we will generally show less deference to that military judge's decisions.

    III. Analysis

    A.  Military Rule of Evidence 702

    As a threshold matter, when deciding whether Ms. Falk would
be allowed to testify, the military judge was obligated to
determine whether her testimony would be helpful to the panel.
M.R.E. 702 states that an expert witness may provide testimony
if it "will assist the trier of fact to understand the evidence
or determine a fact in issue."  Thus, an expert may testify if
his or her testimony is "helpful."  Billings, 61 M.J. at 166.
"A suggested 'test' for deciding 'when experts may be used' is
'whether the untrained layman would be qualified to determine
intelligently and to the best possible degree the particular
issue without enlightenment from those having a specialized
understanding of the subject . . . .'"  United States v. Meeks,
35 M.J. 64, 68 (C.M.A. 1992) (alteration in original) (quoting
Fed. R. Evid. 702 advisory committee's note).

    In the past we have made it clear that expert testimony
about the sometimes counterintuitive behaviors of sexual assault
or sexual abuse victims is allowed because it "assists jurors in
disabusing themselves of widely held misconceptions."  Houser,
36 M.J. at 398; see also United States v. Halford, 50 M.J. 402,
404 (C.A.A.F. 1999) (rape trauma syndrome evidence allowed to
explain common behavioral characteristics in "cases of non-
consensual sexual encounters"); United States v. Peel, 29 M.J.

235, 241 (C.M.A. 1989), cert. denied, 493 U.S. 1025 (1990) (allowing expert to testify that "it was not inconsistent behavior for a rape victim not to immediate[ly] report the offense" or to "act[] as if the rape had never happened"); United States v. Reynolds, 29 M.J. 105, 108 (C.M.A. 1989) (allowing clinical psychologist to testify in order to "counter any adverse inferences which might be drawn from the fact that the victim did not immediately report the offense"); United States v. Carter, 26 M.J. 428, 429 (C.M.A. 1988) (holding that rape trauma syndrome evidence meets the requirements of M.R.E. 702); cf. United States v. Rynning, 47 M.J. 420, 422 (C.A.A.F. 1998) (recognizing that expert testimony explaining the "behavioral characteristics or behavioral patterns of an alleged sexual abuse victim," is helpful "'especially where that behavior would seem to be counterintuitive'" (citation omitted)).

We again affirm the appropriateness of allowing expert testimony on rape trauma syndrome where it helps the trier of fact understand common behaviors of sexual assault victims that might otherwise seem counterintuitive or consistent with consent. However, it is questionable whether Ms. Falk's testimony was truly helpful under the particular circumstances present in the instant case.

To begin with, Ms. Falk was not an expert in rape trauma syndrome. Indeed, trial counsel conceded that point, and the military judge explicitly sought to limit Ms. Falk's testimony to such unexceptional observations as "some [people] scream, some don't, some delay reporting, and some don't." Additionally, the military judge admitted that this limited set of observations was "almost common knowledge." Further, S.A. herself testified explicitly and clearly about why she reacted the way she did both during and after the incident with Appellant. Each of these points thus diminishes the "helpfulness" of Ms. Falk's testimony. However, we ultimately conclude that the limited type of testimony that Ms. Falk was supposed to provide, even when it is elicited from a person with Ms. Falk's qualifications, may be appropriate in certain circumstances. We thus proceed to the question of whether the record before us makes it clear that this particular case presented such circumstances.

B.  The Houser Factors[5]

1.  Qualifications of the Expert

The military judge placed little focus on the foundational question of whether Ms. Falk truly was an "expert witness." There are several possible explanations for this inattention. Perhaps the military judge thought he did not need to explore this issue in depth because the M.R.E. are quite broad in defining an expert as someone who is qualified based on that individual's "knowledge, skill, experience, training, or education."  M.R.E. 702.  The military judge also may have believed that Ms. Falk's qualifications were sufficiently established because he intended to greatly circumscribe the nature and breadth of Ms. Falk's testimony.  Furthermore, the military judge's prior experience with sexual assault experts may have led him to believe he understood the quality of Ms. Falk's credentials and the nature and scope of her pending testimony.  However, we note that the admission of a putative

---

[5] The Houser factors were based in large part on M.R.E. 702 and 703.  These rules were substantively amended in 2004 to conform with the federal rules, which had been amended to reflect the Supreme Court's decisions in Daubert, 509 U.S. at 579, and Kumho Tire, 526 U.S. at 137.  See Manual for Courts-Martial, United States, Analysis of the Military Rules of Evidence app. 22 at A22-52 (2012 ed.) [hereinafter Drafters' Analysis].  We have said that Daubert provides "more detailed guidance on the fourth and fifth Houser prongs pertaining to relevance and reliability."  Griffin, 50 M.J. at 284; see also supra note 3. In the absence of briefing on this issue from either party, we leave for another day the question of how, if at all, the Houser factors were affected by the 2004 amendments.

expert's testimony may be of utmost significance in any criminal trial. Daubert, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading.") (citation and internal quotation marks omitted). Thus, a trial judge must first assure himself or herself that a proffered expert is truly an expert. See United States v. Cauley, 45 M.J. 353, 357 (C.A.A.F. 1996) (holding that it was not error to refuse to allow a police detective to testify on the common behaviors of rape victims); Carter, 26 M.J. at 430 (holding that it was error to allow a United States Army Criminal Investigation Command (CID) agent to offer expert testimony on the common behaviors of rape victims).

We further note that the record reflects significant confusion between the military judge and the trial counsel about the exact nature of Ms. Falk's proffered expertise. After the Government asked to have Ms. Falk recognized as an expert in "sexual assault victim responses" the following colloquy ensued:

> MJ: Ms. Falk will be recognized as an expert in sexual assault -- as a sexual assault response coordinator.
>
> ATC: Thank you, Your Honor.
>
> MJ: Not in sexual assault victim responses or however you put it.

This exchange raises several questions. We first question how an individual can be characterized as an expert based simply on his or her job title. We next question whether there was ever a

"meeting of the minds" between the military judge and the trial counsel about what Ms. Falk was an expert on, and thus we ultimately question whether there was ever a careful determination on the military judge's part about the qualifications of Ms. Falk to serve as an expert witness in this particular case and under these particular circumstances. Finally, we note that the qualitative differences between this witness's practical victim advocacy experience and the qualifications of witnesses in other cases where we have approved of testimony on counterintuitive behavior make it more difficult for us to summarily accept, without more specific factual findings and legal analysis of the issue on the record, the implied conclusion of the military judge that this witness was qualified to testify as she did.[6]

---

[6] See, e.g., United States v. Pagel, 45 M.J. 64, 65 (C.A.A.F. 1996) (doctor/clinical child psychologist admitted as expert in diagnosis and treatment of child sexual abuse); United States v. Marrie, 43 M.J. 35, 41 (C.A.A.F. 1995) (doctor/licensed psychologist admitted as expert to testify regarding "typical patterns of disclosure by victims of sexual child abuse; the potential for false allegations; the possibility of influence on victims by outside coaching; and falsities that may occur when there are custody disputes"); Houser, 36 M.J. at 393 (doctor/counseling psychologist/associate professor admitted as expert to testify regarding rape trauma syndrome); United States v. Suarez, 35 M.J. 374, 375-76 (C.M.A. 1992) (doctor/clinical psychologist admitted as an expert on child sexual abuse); United States v. Carter, 26 M.J. 428, 429 (C.M.A. 1988) (medical doctor/division psychiatrist admitted as expert to testify regarding rape trauma syndrome).

## 2. Subject Matter of Expert Testimony

As stated above, in appropriate circumstances a military judge may allow an expert witness to testify regarding how victims may or may not behave following a sexual assault. Further, an appropriately qualified expert witness also may be able to testify why a sexual assault victim may or may not react in a particular manner. But in the instant case, the trial counsel conceded that Ms. Falk was not qualified to address the issue of why sexual assault victims may or may not behave in a certain way, and the military judge specifically ruled that Ms. Falk could not testify on this point.[7] And yet, Ms. Falk clearly did testify about why sexual assault victims may act in a certain manner,[8] and the trial counsel did not rein her in and the military judge did not issue a curative instruction.

---

[7] MJ:  But again, Government, your expert is not going to testify about this is why she wouldn't have screamed, or this is why some victims don't scream.

ATC: No, Your Honor.

MJ:  She is not going to say any of that.

ATC: That is well beyond her expertise.

[8] Q:  In your experience in dealing with victims, how often have you had a sexual assault victim who at the time of the assault screamed or called for help?

A: Again, almost never.  And, you know, they report afterwards that generally there is the fear of escalating the violence or fear that they are going to be harmed even worse than

We have previously held that an expert witness may not offer opinions that "exceed[] the scope of the witness's expertise." United States v. Birdsall, 47 M.J. 404, 410 (C.A.A.F. 1998). As one federal court explained, an expert witness "must 'stay within the reasonable confines of his [or her] subject area.'" Trilink Saw Chain v. Blount, Inc., 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008) (quoting Lappe v. Am. Honda Motor. Co., 857 F. Supp. 222, 227 (N.D.N.Y. 1994)). Other federal courts have reached the same conclusion. See, e.g., United States v. Brown, 415 F.3d 1257, 1269 (11th Cir. 2005) (chemistry consultant not qualified as expert in controlled substances); Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc., 254 F.3d 706, 715 (8th Cir. 2001) (hydrologist specializing in flood risk management not qualified to testify as expert on safe warehousing practices); Redman v. John D. Brush & Co., 111 F.3d 1174, 1179 (4th Cir. 1997) (metallurgic engineer not qualified to testify as expert in design of safes). In this case, under these circumstances, it was error to permit Ms. Falk to testify as she did because her testimony went beyond the scope of her expertise as it was agreed to by the parties in advance of trial.

---

they already are if they yell or scream for help or upset the individual.

### 3. Basis for Expert Testimony

The third Houser factor addresses the facts and data that an expert is allowed to rely on when forming his or her opinion. Under M.R.E. 703, "an expert's opinion may be based upon personal knowledge, assumed facts, documents supplied by other experts, or even listening to the testimony at trial." Houser, 36 M.J. at 399 (citing United States v. Johnson, 35 M.J. 17, 18 (C.M.A. 1992)). There is no dispute that Ms. Falk's testimony was based on her personal experience as a SARC. However, we discuss below whether the reliability of Ms. Falk's expert opinions, which were based solely on Ms. Falk's personal experience with alleged victims, was properly considered by the military judge.

### 4. Relevance

During an Article 39(a), UCMJ, session, trial counsel made the somewhat startling argument to the military judge that Ms. Falk's testimony was relevant because absent Ms. Falk's testimony, "[o]ur case in chief is defici[en]t." However, the military judge did not probe into why the Government's case-in-chief would be deficient and thus whether Ms. Falk's testimony was truly relevant.

As noted supra, we previously have held that testimony on the counterintuitive behaviors of rape victims is relevant. However, in the instant case, the military judge steadfastly

refused to treat Ms. Falk's testimony as testimony on counterintuitive behaviors.  Instead, at each turn when the military judge acquiesced to the Government's request to have Ms. Falk testify, he chipped away at the scope and the nature of her testimony.  By so doing, he also chipped away at the relevance of Ms. Falk's testimony, and he did so without stating on the record his reasoning.  This state of affairs complicates our review of the matter.

    5. Reliability

The Government, as the proponent of Ms. Falk's expert testimony, had the burden of demonstrating the reliability of Ms. Falk's testimony.  Billings, 61 M.J. at 166.  To show that an expert's opinion is "'connected to existing data'" by more than the "'ipse dixit of the expert,'" the Government may rely on the four Daubert reliability factors or on "alternative indicia of reliability."  Id. at 168 (quoting General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).[9]  And yet, there is little information in the record to indicate that the Government

---

[9] The four reliability factors set out in Daubert are:  (1) whether a theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error in using a particular scientific technique and the standards controlling the technique's operation; and (4) whether the theory or technique has been generally accepted in the particular scientific field.  509 U.S. at 593–94.

squarely addressed these points specifically, or the issue of Ms. Falk's reliability more generally.

The Government did proffer that Ms. Falk would base her testimony on her personal interactions with individuals who were sexually assaulted, and M.R.E. 702 permits an expert to be qualified by reason of experience rather than skill, training, or education. In other words, "experience in a field may offer another path to expert status." United States v. Frazier, 387 F.3d 1244, 1260–61 (11th Cir. 2004). Even so, "the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is sufficient foundation rendering reliable any conceivable opinion the expert may express." Id. at 1261 (emphasis added). As the Advisory Committee's notes on Fed. R. Evid. 702 explain:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion and how that experience is reliably applied to the facts.

Fed. R. Evid. 702 advisory committee's note (on 2000 amendments).[10] In other words, the military judge should have stated on the record why he concluded that Ms. Falk's testimony was reliable.[11] And yet, the military judge did not do so.

_____

[10] M.R.E. 702 was amended in 2004 to parallel a 2000 amendment to Fed. R. Evid. 702. Drafters' Analysis app. 22 at A22-52.
[11] We note that Ms. Falk's opinion was based on her interaction with individuals who stated that they had been sexually

6. Probative Value

Finally, there is virtually no evidence in the record that the military judge weighed the probative value of Ms. Falk's pending testimony against its potential prejudicial effect. Indeed, the probative value of Ms. Falk's testimony appears to have been quite limited. To begin with, it is an established principle "that expert testimony cannot be used solely to bolster the credibility of the government's fact-witnesses by mirroring their version of events." United States v. Cruz, 981 F.2d 659, 664 (2d Cir. 1992). A military judge must distinguish between an expert witness whose testimony about behaviors of sexual assault victims that are subject to "widely held misconceptions" will be helpful to the trier of fact, Houser, 36 M.J. at 398, and an expert witness whose testimony will simply mirror the specific facts of the case and serve only to bolster the credibility of a crucial fact witness. See United States v. Castillo, 924 F.2d 1227, 1232 (2d Cir. 1991) ("If the testimony is instead directed solely to 'lay matters which a jury is capable of understanding and deciding without the expert's help,' the testimony is properly excludable." (internal citation omitted)); see also Cauley, 45 M.J. at 358 (recognizing that "[e]xpert testimony on credibility is not admissible at courts-

---

assaulted, although Ms. Falk had no means of determining what percentage of those individuals was being truthful.

martial"); United States v. King, 35 M.J. 337, 342 (C.M.A. 1992) ("[W]e do not allow witness opinion regarding the truthfulness of another person.").[12]

In the instant case, S.A. gave a direct and credible explanation for why she did not scream or struggle more or immediately notify her parents of the sexual assault. Thus, Ms. Falk's purported expert testimony was not helpful because the panel members could understand what had happened based on S.A.'s own explanation. Therefore, once the military judge had placed strict limitations on Ms. Falk's testimony -- which thereby rendered the observations of the expert witness "almost common knowledge" -- its probative value had been severely eroded.

On the other hand, the prejudicial effect of Ms. Falk's testimony was quite likely substantial in this case. This was a classic "he said-she said" case, with the two primary witnesses giving diametrically opposed testimony on the critical issue of whether the sexual intercourse was consensual. "[I]n cases of

---

[12] Bolstering, as we have used the term here, "occurs before impeachment, that is when the proponent seeks to enhance the credibility of the witness before the witness is attacked." United States v. Toro, 37 M.J. 313, 315 (C.M.A. 1993). We do not, in this case, need to address whether Ms. Falk's testimony would have been appropriate if the defense had specifically attacked S.A.'s version of events as improbable victim behavior. See, e.g., Cruz, 981 F.2d at 664 ("Nor do we hold that expert testimony may not be used on some occasions to explain even non-esoteric matters, when the defense seeks to discredit the government's version of events as improbable criminal behavior.").

this sort where there is often a 'one-on-one' situation, anything bolstering the credibility of one party inherently attacks the credibility of the other . . . ." United States v. August, 21 M.J. 363, 365 n.4 (C.M.A. 1986).  Therefore, the danger of bolstering in this case was significant.  More importantly, actual bolstering occurred in this case because after S.A. already had clearly and directly testified to the panel members why she did not struggle more with her assailant, Ms. Falk provided additional testimony on the same point of why victims do not struggle more with their attackers.  This bolstering was of particular concern because even the Government conceded that Ms. Falk did not have a legitimate basis to testify on this point, and the military judge had explicitly placed such testimony by Ms. Falk off-limits.[13]

Summary

Thus, although limited testimony from a witness with qualifications similar to those of Ms. Falk may be appropriate in certain circumstance, we conclude that the military judge did not place sufficient evidence on the record to demonstrate that

---

[13] We note that defense counsel did not make a specific objection when Ms. Falk's testimony exceeded the parameters issued by the military judge.  However, we also note that defense counsel had made repeated blanket objections to Ms. Falk's testimony right from the outset of this court-martial.  Further, we note that the military judge was under a continuing obligation to ensure that the testimony was limited to the parameters he had set out previously.  Wheeling Pittsburgh Steel Corp., 254 F.3d at 715.

he acted within the bounds of his discretion when he authorized Ms. Falk to testify as an expert witness in the instant case. Therefore, we find that he erred.  Finding error, we must test for prejudice.

    C.  Prejudice

    Under Article 59(a), UCMJ, a "finding or sentence of a court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused."  10 U.S.C. § 859(a) (2012); United States v. Yammine, 69 M.J. 70, 78 (C.A.A.F. 2010).  "The test for nonconstitutional evidentiary error is whether the error had a substantial influence on the findings."  United States v. Gunkle, 55 M.J. 26, 30 (C.A.A.F. 2001) (citing Kotteakos v. United States, 328 U.S. 750, 765 (1946); United States v. Pollard, 38 M.J. 41, 52 (C.M.A. 1993)).  Importantly, it is the Government that bears the burden of demonstrating that the admission of erroneous evidence is harmless.  United States v. Berry, 61 M.J. 91, 97–98 (C.A.A.F. 2005).

    To determine whether the Government has carried its burden, we weigh four factors:  (1) the strength of the Government's case; (2) the strength of the defense's case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question.  Id. at 98.

Although these are four distinct factors, all of them revolve around one single point: namely, the central question at trial was whether S.A. consented to the sexual intercourse or whether Appellant forced himself on her or took advantage of her drunken state. The Government evidence on this issue consisted of S.A.'s clear testimony that she was drunk, that she did not invite Appellant to her room, that she did not consent to have sex with him, and that she repeatedly told him "no." In juxtaposition, the defense put Appellant on the stand where he testified that the alleged assault was an invited, consensual sexual encounter. The result was a "he said–she said" case, where the outcome largely depended on whether the panel found S.A. or Appellant more credible.

Under this scenario, Ms. Falk's testimony could have been of considerable significance in the minds of the panel members because it seemed to corroborate and ratify S.A.'s version of events. Therefore, we do not find that the Government has met its burden of demonstrating that Ms. Falk's improperly admitted testimony "did not have a substantial influence on the . . . findings." Gunkle, 55 M.J. at 30.

## DECISION

The decision of the United States Army Court of Criminal Appeals is affirmed in part and reversed in part. The part of the decision regarding Charge III and its Specifications is

affirmed.  The part of the decision affirming the finding of guilty to the offense of aggravated sexual assault and the sentence is reversed, and the finding of guilty to that offense and the sentence are set aside.  The record of trial is returned to the Judge Advocate General of the Army.  A rehearing on the charge of aggravated sexual assault and the sentence is authorized.

United States v. Flesher, No. 13-0602/AR

    BAKER, Chief Judge (dissenting):

    The military judge serves as the gatekeeper in assessing expert opinion evidence in accordance with Military Rule of Evidence (M.R.E.) 702. United States v. Houser, 36 M.J. 392 (C.M.A. 1993); see also United States v. Billings, 61 M.J. 163, 167 (C.A.A.F. 2005). The threshold for admissibility of expert testimony is whether the testimony is relevant, reliable, and will assist the trier of fact. Houser, 36 M.J. at 399-400. However, the majority appears to adopt a new and expansive test for admission of testimony by a Sexual Assault Response Coordinator (SARC) in sexual assault cases. Heretofore, Houser served as the threshold for admission of evidence under M.R.E. 702. The majority's new approach seems to treat even the ordinary process of admitting specialized knowledge in the form of SARC testimony as if it were novel scientific evidence for which a Daubert hearing is required.[1] I would stick with the Houser test.

    The majority states, as the Court did in Houser, that it is appropriate to "allow[] expert testimony on rape trauma syndrome

_____

[1] The majority states that "we do not hold that a military judge is always required to conduct a formal Daubert hearing," United States v. Flesher, __ M.J. __, __ (21) (C.A.A.F. 2014), but at the same time "we must determine de novo whether the military judge properly followed the Daubert framework." Id. at __ (16) (internal quotation marks and citation omitted). The majority further asserts that "the most important [concern] is the fact that the military judge did not conduct even a rudimentary Daubert hearing." Id. at __ (20).

where it helps the trier of fact understand common behaviors of sexual assault victims that might otherwise seem counterintuitive." Flesher, __ M.J. at __ (23). In Houser, the Court concluded: "Certain behavioral patterns such as failure to resist or delay in reporting a rape could be confusing to the factfinders because these may be counter-intuitive." 36 M.J. at 399. Accordingly, the evidence in this case was relevant. The SARC here also had specialized knowledge, to wit, the observational experience of having interviewed in her professional capacity thousands of alleged and confirmed victims of sexual assault. Nonetheless, this case presents a fairly close call because the record is succinct and sometimes hurried on how the military judge applied the Houser factors. However, because this Court, like Article III courts, applies a liberal standard of admission, I conclude for the reasons below that the military judge did not abuse his discretion in admitting the expert's testimony. Therefore, I respectfully dissent.

A. Standard of Review

A military judge's decision permitting expert testimony is reviewed for an abuse of discretion. United States v. Billings, 61 M.J. 163, 166 (C.A.A.F. 2005). "[W]hen judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of

2

judgment . . . ." Houser, 36 M.J. at 397 (internal quotation marks and citations omitted). Where the military judge's analysis is clear and on the record it receives greater deference. United States v. Bush, 47 M.J. 305, 311 (C.A.A.F. 1997). In the absence of analysis on the record, an appellate court will necessarily review the admission of evidence de novo. See, e.g., Metavante Corp. v. Emigrant Sav. Bank, 619 F.3d 728, 760 (7th Cir. 2010); Naeem v. McKesson Drug Co., 444 F.3d 593, 607-08 (7th Cir. 2006). We do not grant relief where expert testimony is erroneously admitted unless the error was prejudicial. Article 59(a), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 859(a) (2012).

B. M.R.E. 702

M.R.E. 702[2] codifies the gatekeeping function of the military judge in admitting testimony by expert witnesses. The rule contemplates that expert testimony may include "scientific, technical, or other specialized knowledge." It follows that the threshold for admission is not necessarily the same for every

---

[2] M.R.E. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

proffer of expert testimony.  Indeed, a witness may be "qualified as an expert by knowledge, skill, experience, training, or education."  M.R.E. 702.  A novel scientific method, therefore, would require a different foundation than that of specialized knowledge deriving from observational experience.  Thus, while "expert witness" may conjure up an image of a Ph.D. trained in nuclear engineering or an M.D. trained in human genetics, the rule allows any person with "specialized knowledge" based on "experience" to serve as an expert as long as his or her testimony meets relevancy and reliability requirements.  Id.

This Court also applies a "liberal" standard for admission of expert testimony.  United States v. Diaz, 59 M.J. 79, 89 (C.A.A.F. 2003) (citation omitted); see also United States v. Peel, 29 M.J. 235, 241 (C.M.A. 1989) ("[A]dmissibility of expert testimony has been broadened.  Indeed, anyone who has substantive knowledge in a particular field which exceeds that of the average court member arguably is an expert within that field; and the type of qualification within that field that the witness possesses goes to the weight to be given the testimony and not to its admissibility.").  M.R.E. 702 tracks with the federal rule, under which expert testimony is liberally admissible.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 588 (1993) (noting the "liberal thrust" of the Federal

Rules of Evidence governing expert testimony and their "general approach of relaxing the traditional barriers to opinion testimony" (internal quotation marks and citations omitted)); see also Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993) ("The witness'[s] qualifications to render an expert opinion are also liberally judged by Rule 702."); Canino v. HRP, Inc., 105 F. Supp. 2d 21, 28 (N.D.N.Y. 2000) ("[T]he Court's role as gatekeeper is tempered by the liberal thrust of the Federal Rules of Evidence. . . . Accordingly, doubts about the usefulness of an expert's testimony, should be resolved in favor of admissibility." (citations and internal quotations marks omitted)); Lappe v. Am. Honda Motor Co., 857 F. Supp. 222, 227 (N.D.N.Y. 1994), aff'd, 101 F. 3d 682 (2d Cir. 1996) ("Liberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications."). Indeed, some Article III courts appear to view this liberal admissibility standard as relatively low.  See, e.g., Hammond v. Int'l Harvester Co., 691 F.2d 646, 653 (3d Cir. 1982) (automotive and mechanical equipment salesman qualified to testify as an expert in a products liability action involving a tractor even though he did not have a degree in engineering or physics and had no formal education); United States v. Johnson, 575 F.2d 1347, 1360 (5th Cir. 1978) (former actor qualified to

testify as an expert on the origin of marijuana even though "his qualifications came entirely from 'the experience of being around a great deal [of marijuana] and smoking it'").

C. Application of the Standard

In this case, the Government offered testimony by Ms. Falk, the SARC, in the form of her specialized knowledge on the common behaviors of sexual assault victims. This knowledge derived from Ms. Falk's experience as a SARC and as an advocate for "thousands" of victims of sexual assault. Because the military judge applied M.R.E. 702 to the admission of this expert opinion evidence, albeit in a preemptive manner, this Court reviews his ruling for an abuse of discretion with some deference.

Relevance. The first question is whether the proffered evidence was relevant. Appellant argued by implication that no victim would respond to sexual assault (or fail to respond) as the victim here did. In particular, the defense suggested that the victim's failure to scream or call out to her brother or other family members in her home demonstrated consent. The Government was therefore entitled to rebut this inference with properly admitted evidence to prove its case. As the majority affirms and as this Court stated in Houser:

> Certain behavioral patterns such as failure to resist
> or delay in reporting a rape could be confusing to the
> factfinders because these may be counter-intuitive. .
> . . It is logically relevant for an expert to explain
> that certain behavior patterns occur in a certain

>     percentage of rape cases or child abuse cases.  This
>     is not to say that the offense occurred but, rather,
>     that these events may happen to some victims.  Without
>     the testimony the members are left with their own
>     intuition.

36 M.J. at 399.

Consequently, unless this Court is overruling Houser, the expert testimony was relevant.

Reliability.  Since the majority appears to concede that Ms. Falk's testimony did not lack relevance, the reliability of her testimony will determine whether the military judge abused his discretion.  Reliability, in turn, depends on whether we continue to consider the Houser factors or adopt the majority's approach, which would effectively make Daubert the sole and mandatory test.

Ms. Falk was an experienced advocate for victims of sexual assault who was hired by the Department of Defense to serve as a SARC.  A SARC is "[t]he single point of contact at [a military] installation or within a geographic area who oversees sexual assault awareness, prevention, and response training; coordinates medical treatment, including emergency care, for victims of sexual assault; and tracks the services provided to a victim of sexual assault from the initial report through final disposition and resolution."  Dep't of Defense Dir. 6495.01, Sexual Assault Prevention and Response Program (SAPR) 17 (Jan. 23, 2012).  The credentialing process for a SARC requires a minimum of forty

hours of training for initial certification followed by an additional thirty-two hours of continuing education every two years, including on sexual assault victims' responses to trauma. Sexual Assault Prevention and Response Office, U.S. Dep't of Defense, Fact Sheet:  SAPR Training, available at http://www.sapr.mil/index.php/prevention/prevention-program-elements/prevention-education.  Prosecution Exhibit 6 is Ms. Falk's curriculum vitae (CV).  At the time of the military judge's ruling, the record indicates that this exhibit was before him.  The CV details Ms. Falk's education, training, and experience working with sexual assault victims.  Her duties included "short-term . . . counseling" of victims of sexual assault and assisting them through the "medical, investigative, and legal process[es]" that follow their claims of sexual assault.  She testified that she had worked with "[t]housands [of victims claiming sexual assault].  A couple thousand probably over the years.  It is generally a couple hundred per year."  She also stated that "[m]ore than a third" of those had resulted in a court-martial or civilian trial and among those "a large portion" had ended in a conviction, thereby confirming that she had interviewed actual victims of sexual assault. Exercising his "considerable leeway" in evaluating reliability, the military judge considered these qualifications and allowed voir dire of Ms. Falk on the record.  Kumho Tire Co. v.

Carmichael, 526 U.S. 137, 152 (1999) ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.").

It seems to me it is not an abuse of discretion to conclude that a Department of the Army-trained SARC who has interviewed more than one thousand sexual assault victims would have specialized knowledge about common victim behaviors. The reliability of her testimony depends on knowledge and experience, not methodology or theory. All the more so when the military judge limited her testimony to three questions the answers to which were necessarily based on specialized knowledge drawn from informed observation as opposed to specialized scientific or technical methods. He directed trial counsel to ask Ms. Falk only "whether or not . . . most victims put up a fight or not; scream or not; and who their first report is made to, law enforcement or not law enforcement." Significantly, Ms. Falk did not testify that the behavior of the victim was consistent with that of the victims she had interviewed.

The majority nonetheless concludes that the military judge abused his discretion. Their principal objection appears to be that Ms. Falk was not an "expert in rape trauma syndrome," but

the military judge did not admit her testimony on that basis.[3] Flesher, __ M.J. at __ (24). Neither is there a requirement that she be one. The majority also concludes the military judge erred by not conducting a Daubert analysis. Id. at __ (20-21). But Ms. Falk was not offering scientific evidence. She was offering experiential evidence -- specialized knowledge -- based on thousands of victim interviews. Her testimony did not involve the introduction of a "theory or technique" that "can be (and has been) tested" and "subjected to peer review and publication" or has a "known or potential rate of error." Daubert, 509 U.S. at 593-94.

Daubert itself emphasized that the factors were neither exclusive nor dispositive. Id. at 593. In addition, the Advisory Committee's note to the 2000 amendment to Federal Rule of Evidence 702 recognized that not all Daubert factors apply to every type of expert. Fed. R. Evid. 702 advisory committee's note. In Kumho, the Court held that the Daubert factors might be applicable in assessing the reliability of nonscientific expert testimony, but that determination would depend on "the particular circumstances of the particular case at issue." 526

---

[3] While I recognize, as the American Psychiatric Association (APA) does, that sexual assault is a traumatic event that may lead to posttraumatic stress disorder, I do not use the term "rape trauma syndrome" because the APA has not listed it as an illness in the Diagnostic and Statistical Manual of Mental Disorders. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 463-68 (text rev. 4th ed. 2000).

U.S. at 150. Ms. Falk was the type of expert who, rather than providing an opinion, provided testimony intended to educate the trier of fact about certain factual issues raised in the case. For this type of expert, the federal rule requires only that (1) the witness have the requisite qualifications to give expert testimony, (2) the testimony address a subject matter as to which the witness can be of help to the trier of fact, (3) the proposed testimony be reliable, and (4) the proposed testimony fit the facts of the case. See 4 Weinstein's Federal Evidence, § 702.02[3] (2d ed. 2014). Ms. Falk testified as to what the individuals with whom she had had contact reported to her about their emotional and physical responses to sexual assault. Thus, given the defense theory of the case that the victim had consented to sexual intercourse with Appellant, in addition to Ms. Falk's training and experience, her testimony was helpful to the members.

Assists the Factfinder. The third and final question the Houser test asks is whether the testimony will assist the members as factfinders. The answer to this question largely hinges on the analysis in Houser regarding counterintuitive behavior. 36 M.J. at 400. The fact is the military judge strictly limited Ms. Falk's testimony. In the context of this case, in which the defense implied the victim did not act like a "real" victim, I do not believe the military judge erred by

11

allowing the Government to offer the specialized knowledge of a
SARC who had assisted thousands of victims of sexual assault
since she could assist the factfinder in assessing defense
counsel's argument.  And, of course, Ms. Falk's testimony was
not offered in a vacuum.

    D.  Prejudice

Even if the military judge erred, Appellant was not
prejudiced.  Defense counsel's own expert witness, Christina
Thomas, a Sexual Assault Nurse Examiner and emergency department
nurse, served as an adequate counterweight to Ms. Falk.  Her
education and experience matched and arguably exceeded that of
Ms. Falk.  Ms. Thomas testified that "people respond to trauma
or stressors in all the ways of the emotional spectrum.  There
is no typical way for someone to react."  Combined with Ms.
Falk's testimony, Ms. Thomas's testimony made clear to the
members that although many victims of sexual assault respond
with behaviors that are often counterintuitive to the public's
expectations, they do not all react alike.  She conveyed to the
members that there is no single, "correct" response to sexual
assault.

Defense counsel also cross-examined Ms. Falk and elicited
from her an acknowledgment that as a victim advocate, she was
required to believe the victim's accusation of sexual assault.
The members were thus aware of Ms. Falk's position and function.

They were not left with the impression that she was capable of evaluating the truth of a victim's claim. Her testimony merely reflected her own experience and the consensus of the academic research on sexual assault that a victim's fear, shame, and guilt commonly result in his or her failure to report the crime immediately. The members, therefore, were provided the proper context in which to evaluate the victim's credibility.

Finally, the evidence against Appellant was strong. His failure even to acknowledge that he and the victim were intoxicated that night even though the victim had had at least three mixed drinks could have suggested to a reasonable trier of fact that he was being less than truthful. Appellant's claim that he was concerned for the victim's well-being while providing the sixteen-year-old with alcohol and cigarettes also apparently impacted his credibility. Finally, Appellant never explained why, if the victim and he had planned to have sexual intercourse, they did not do so in his home, alone, instead of in the victim's home where three other people, including her stepfather and mother, were sleeping. These facts, rather than Ms. Falk's brief testimony, were the reasons the members concluded that Appellant was guilty of sexual assault.

For the foregoing reasons, I respectfully dissent.

United States v. Flesher, No. 13-0602/AR

RYAN, Judge (dissenting):

Contrary to the majority's conclusion, the military judge abandoned his role as a gatekeeper in the first instance. Nonetheless, I agree with Chief Judge Baker that there was no prejudice.  I respectfully dissent.

A.

The framework for evaluating expert testimony is well established.  "M.R.E. 702 dictates the admissibility of expert testimony."  United States v. Sanchez, 65 M.J. 145, 149 (C.A.A.F. 2007).  "Interpreting the analogous Fed. R. Evid. 702 in Daubert[ v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993)], the Supreme Court . . . made clear that the trial court has a 'gatekeeping' role."  Id. (quoting Daubert, 509 U.S. at 589). It is incumbent upon trial judges to "'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999) (quoting Daubert, 509 U.S. at 589).  No less is required when evaluating expert testimony that is not based on science.  This obligation is necessary because expert witnesses have "testimonial latitude unavailable to other witnesses on the 'assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.'"  Id. at 148 (quoting Daubert, 509 U.S. at 592).  Thus, where expert "testimony's factual basis, data, principles, methods, or their application are

called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" Id. at 149 (second alteration in original) (quoting Daubert, 509 U.S. at 592).

Although a military judge "must have considerable leeway" to decide how to test an expert's reliability and whether an expert's testimony is sufficiently reliable, id. at 152, a military judge does not have the "discretion to abandon the gatekeeping function." Id. at 158-59 (Scalia, J., concurring). When a military judge properly exercises his role as a gatekeeper, we review the military judge's rulings regarding the admission of expert testimony for an abuse of discretion. United States v. Griffin, 50 M.J. 278, 284 (C.A.A.F. 1999); see also Kumho, 526 U.S. at 154. Nevertheless, it is necessary to "review de novo the question whether the military judge properly followed the Daubert framework" in performing its role as a gatekeeper. Griffin, 50 M.J. at 284; see also United States v. Roach, 582 F.3d 1192, 1206 (10th Cir. 2009) ("'[W]e review de novo the question of whether the district court applied the proper standard and actually performed its gatekeeper role in the first instance. We then review the trial court's actual application of the standard in deciding whether to admit or

exclude an expert's testimony for an abuse of discretion.'") (alteration in original) (emphasis added) (citation omitted).[1]

## B.

The problem in this case is that the military judge made no attempt to apply the framework of Daubert, Kumho, United States v. Houser, 36 M.J. 392, 397 (C.M.A. 1993), M.R.E. 702, or any other authority addressing expert testimony. The military judge identified no guiding principles, provided no factual findings or legal analysis on the record, and cited no relevant law to support his decision to allow Ms. Falk to testify. While it is certainly true that the military judge "need not 'recite the Daubert standard as though it were some magical incantation,'" where, as here, a party objects to potential expert testimony, the military judge "must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper." Goebel v. Denver & Rio Grande W. R.R. Co., 215 F.3d 1083, 1088 (10th Cir. 2000) (citation omitted). Without this type of record development, "it is impossible on appeal to determine whether the [military judge] carefully and meticulously review[ed] the proffered [expert] evidence or

---

[1] Several circuit courts apply a similar approach. See, e.g., Manpower, Inc. v. Ins. Co. of Pa., 732 F.3d 796, 805 (7th Cir. 2013); Smith v. Jenkins, 732 F.3d 51, 64 (1st Cir. 2013); Elcock v. Kmart Corp., 233 F.3d 734, 745 (3d Cir. 2000); Pride v. BIC Corp., 218 F.3d 566, 578 (6th Cir. 2000).

simply made an off-the-cuff decision to admit the expert

testimony." Id. (second alteration in original) (citation

omitted) (internal quotation marks omitted).

The only on-the-record discussion of Ms. Falk's expertise

did not focus on Ms. Falk's qualifications and reliability;

rather, it focused on the conclusions the military judge

expected Ms. Falk to reach based on the testimony of other

experts in other cases.  For example, the military judge

observed:

> Defense, based on my experience all these experts will say
> some [victims] scream, some don't, some delay reporting,
> some report immediately, and I would think that the
> government's expert would admit all that on cross-
> examination. . . . [W]here I have seen this, is that the
> government more usually feels compelled to present that
> evidence so when they stand up and argue to the panel
> that's not unusual for someone not to scream . . . . They
> feel compelled to present that evidence so that they don't
> get the objection from the defense saying, hey, those are
> facts not in evidence.

This approach is plainly contrary to the Daubert framework,

which requires the focus "be solely on principles and

methodology, not on the conclusions that they generate."  See

509 U.S. at 594–95.  Moreover, under the Daubert framework, the

military judge's actual task is "to decide whether this

particular expert had sufficient specialized knowledge to assist

the jurors in deciding the particular issues in the case."

Kumho, 526 U.S. at 156 (emphasis added) (citations omitted)

(internal quotation marks omitted).  Had he done so, it should

have been plain, for the reasons identified by the majority, see, e.g., United States v. Flesher, __ M.J. __, __ (25-27) (C.A.A.F. 2014), that Ms. Falk would not provide the kind of counterintuitive behavior testimony we have endorsed in other cases, see, e.g., United States v. Pagel, 45 M.J. 64, 68 (C.A.A.F. 1996), but instead only inherently biased, hearsay-based testimony on an area of expertise defined only by the witness's job title, i.e., "sexual assault response coordinator."[2] For, in essence, the sole basis for Ms. Falk's testimony was that she had encountered thousands of putative victims -- and believed them.

The majority acknowledges these and other shortcomings in the military judge's review of Ms. Falk's reliability, see Flesher, __ M.J. at __ (20, 26, 28-32, 34–35) (emphasizing the

---

[2] To be sure, a sexual assault response coordinator is a proper and useful role, but this job title neither defines an area of recognized expertise nor alone qualifies Ms. Falk as an expert. Ms. Falk's limited voir dire established little beyond the fact that she is likely too closely tied to those for whom she advocates to be either neutral or detached, let alone either scientific or helpful as contemplated by M.R.E. 702. I do not disagree with either the majority, Flesher, __ M.J. at __ (22-23), or Chief Judge Baker, id. at __ (6-7, 11) (Baker, C.J., dissenting), that expert testimony on counterintuitive behaviors of sexual assault victims may, in certain cases, be relevant and helpful to the trier of fact. See Houser, 36 M.J. at 398. It is paramount, however, that the military judge provide some indication on the record that he applied the appropriate legal framework in carrying out an individualized review of the particular "expert" witness's reliability, and area of expertise.

military judge's failure to create a record or inquire into the Houser factors), yet inexplicably concludes that "the military judge did perform an adequate, if not exemplary, preliminary gatekeeping inquiry." Id. at __ (21). Without any indication in the record that the military judge properly applied the relevant law, I simply cannot agree. The standards for gatekeeping and admissibility are low,[3] but they are not nonexistent -- a military judge engaging in no inquiry under the applicable law, even though asked to, and relying entirely on past experts who testified in other cases, is not enough. Accordingly, I would find that the military judge erred by abdicating his gatekeeping duty to evaluate the reliability of Ms. Falk's purportedly "expert" testimony. Nevertheless, for all the reasons stated by Chief Judge Baker, I agree that there was no prejudice in this case.

I respectfully dissent.

---

[3] The military judge's abdication of his gatekeeping role by failing to apply the appropriate legal standard also implicates an abuse of discretion in admitting Ms. Falk's testimony. See United States v. Avitia-Guillen, 680 F.3d 1253, 1257 n.3 (10th Cir. 2012) ("When a district court neglects its gatekeeping function, it commits two errors. First, it commits error, reviewable de novo, by not making a reliability determination. Second, it abuses its discretion when it admits the expert testimony without a reliability determination.").